IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA,               :       CRIMINAL ACTION
                                        :       NO. 16-130 -01, -02
      v.                                :
                                        :
CHARLES M. HALLINAN, et al.             :


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                                   December 4, 2017


          In this criminal action, the Government sought to
introduce at trial fifteen documents withheld by a law firm in
response to a subpoena, the testimony of the law firm's partner,
who represented one of the defendants, concerning the subject
matter of the documents, and the testimony of two other
attorneys, who represented a company which was alleged to be
owned by one of the defendants.  Defendant Charles M. Hallinan
and an uncharged third party intervenor objected to the
admission of the documents and testimony on the basis that they
are protected by the attorney-client privilege, the attorney
work product privilege, or the community-of-interest privilege.
The Government disputed the assertions of privilege, and argued
that, to the extent any privilege exists, it was unavailable
here by application of the crime-fraud exception.

The Court reviewed the documents _in camera_, and held two hearings, portions of which were _ex parte_ and _in camera_, at which it allowed Hallinan and the third-party intervenor to object to the testimony of the attorney witnesses on the basis of privilege.

Following each of the hearings, the Court determined that, in the first instance, all of the documents before it and portions of the testimony of the three attorneys are protected by the attorney-client, attorney work product, or community-of-interest privileges. Nevertheless, with respect to the fifteen documents and the testimony of one of the attorneys, the Court found that the protection is lost by application of the crime-fraud exception, and allowed the Government to introduce the documents and that attorney's testimony at trial.

The Court issued its ruling in orders dated October 11, 2017, October 23, 2017, and October 30, 2017. The case proceeded to trial, and the defendants were convicted. The Court now supplements the legal reasoning for the issuance of those orders.

## I.    THE SUPERSEDING INDICTMENT

Defendants Charles M. Hallinan, Wheeler K. Neff, and Randall P. Ginger ("Defendants") were indicted by a grand jury on charges of conspiracy to violate the Racketeer Influenced and

Corrupt Organization ("RICO") Act, conspiracy to commit fraud, mail fraud, wire fraud, and money laundering.[1]  A second grand jury was later empaneled and returned a superseding indictment.

The superseding indictment charged that, from at least 1997 until 2013, Defendant Hallinan owned, operated, controlled, and financed numerous business entities based in Bala Cynwyd, Pennsylvania, which issued, serviced, funded, and collected debt from small, short-term, high-interest loans, commonly referred to as "payday loans" because they were meant to be repaid when the borrower received his or her next paycheck ("the Hallinan Companies").  See Superseding Indictment at 2, ECF No. 87. According to the superseding indictment, Hallinan directed some of his companies to charge fees of approximately thirty dollars for every one hundred dollars borrowed, which translated to annual percentage rates of interest of approximately 780 percent, given the short-term nature of the loans.  Id.  The grand jury charged that the payday loans issued by the Hallinan Companies violated the laws of Pennsylvania and more than a dozen other states restricting the amount of interest permissible on personal loans.  See id. at 5-6.

According to the superseding indictment, Hallinan, aided and abetted by Defendant Neff, attempted to avoid the

---

[1]      Defendant Neff was not indicted on the charges of money laundering.

operation of state lending laws restricting the issuance of payday loans by entering into multiple partnerships with Native American tribes, who would then claim sovereign immunity from the state lending laws. See id. at 7-8. The superseding indictment charged that these partnerships were a sham, as the tribes had very little connection to the day-to-day operations of the payday lending operations, and did not provide the money advanced for the payday loans, service the loans, collect on the loans, or incur any losses if the borrowers defaulted. Id. at 8. The grand jury further charged that Hallinan paid the tribes at least $10,000 a month in return for the tribes' agreement to claim ownership of the various Hallinan Companies and assert sovereign immunity. Id.

Apex 1 Processing, Inc. ("Apex 1") is a payday lending corporation incorporated by Hallinan in Florida in July 2008. See id. at 13. According to the superseding indictment, in November 2008, Hallinan pretended to sell Apex 1 to an entity owned by Defendant Ginger, a purported chief of a Canadian-based Native American tribe. See id. at 13-14. As part of their agreement, Hallinan promised to pay approximately $10,000 per month to Ginger, and Ginger promised to claim that his tribe owned Apex 1 whenever necessary to evade state payday lending laws and regulations. See id.

On March 23, 2010, payday loan borrowers filed a class action lawsuit in Indiana state court against Apex 1 ("the Indiana Litigation"). Id. at 32. The borrowers alleged that Apex 1 issued payday loans to them that violated Indiana law. See id. On May 8, 2013, the Indiana state court certified a class of 1,393 plaintiffs in the Indiana Litigation ("the Indiana Plaintiffs"). See id. at 33. According to the superseding indictment, beginning around July 2013, Hallinan, Neff, and Ginger engaged in a scheme to defraud the Indiana Plaintiffs by deceiving them into believing that Apex 1 was effectively judgment proof so that they would accept a discounted settlement offer on their claims. See id. at 33-34.

The superseding indictment further charged that, in order to convince the Indiana Plaintiffs that Apex 1 was judgment proof, Defendants defrauded the plaintiffs into believing that (1) Ginger was the sole owner of Apex 1, (2) Ginger was a Canadian Indian chief who lived on tribal lands in Canada, (3) Apex 1 had few if any assets that could be recovered, and (4) Hallinan did not exercise managerial control over Apex 1. See id. at 34-35. According to the grand jury, Hallinan took part in this scheme after Neff warned him, in July 2013, that if the Indiana Plaintiffs established that Hallinan had not actually sold Apex 1 to Ginger in 2008, Hallinan could face personal exposure of up to $10 million. See id. at 33.

In April 2014, the Indiana Plaintiffs agreed to settle their claims for approximately $260,000, although their attorneys had valued their clients' cause of action at greater than $2.6 million.  See id. at 36.  According to the superseding indictment, Hallinan caused one of the Hallinan Companies to pay the entirety of the settlement.  See id. at 36-37.

## II.  PROCEDURAL HISTORY

Defendants were first charged by indictment on March 31, 2016.  ECF No. 1.  A superseding indictment was issued on December 1, 2016.  ECF No. 87.  Defendants Hallinan and Neff filed a motion to dismiss the charges against them on February 8, 2017, ECF No. 149, which the Court denied on August 15, 2017, ECF No. 203.  A jury trial commenced on September 26, 2017 against Hallinan and Neff,[2] and the jury returned a guilty verdict against both Defendants on all counts of the superseding indictment on November 27, 2017.[3]

Prior to trial, the Government issued a subpoena to the Chartwell Law Offices LLP ("Chartwell") to produce various categories of documents related to the Indiana Litigation.  In

---

[2]     Ginger did not appear for trial.  He is reportedly currently living in Canada.

[3]     Hallinan and Neff were each convicted of two counts of RICO conspiracy, one count of conspiracy to commit fraud, two counts of mail fraud, and three counts of wire fraud.  Hallinan was also convicted of nine counts of money laundering.

response to the subpoena, Chartwell withheld fifteen documents on the basis of the attorney-client privilege and the attorney work product privilege with respect to the firm's representation of Apex 1 and Hallinan in his personal capacity in the Indiana Litigation ("the Chartwell Documents").

At trial, the Government sought to introduce all fifteen of the Chartwell Documents, on the basis that even if the documents are protected by the attorney-client privilege or the attorney work product privilege in the first instance, any privilege is lost through the application of the crime-fraud exception. The Government also sought to introduce the testimony of (1) Kenneth M. Dubrow, Esquire, a Chartwell attorney who represented Apex 1 and Hallinan in the Indiana Litigation; (2) Susan Verbonitz, Esquire, an attorney employed by Weir & Partners, LLP ("Weir"), who represented Apex 1 at an earlier point in the Indiana Litigation; and (3) Lisa Mathewson, Esquire, an attorney and sole practitioner from the Law Offices of Lisa A. Mathewson LLC, who represented Apex 1 in the grand jury investigation in this case.

The Government filed a motion under seal requesting that the Court perform an in camera review of the Chartwell Documents pursuant to United States v. Zolin, 491 U.S. 554 (1989), and conduct an in camera hearing of the testimony of the three attorney witnesses, using questions provided by the

Government, in order to determine whether the crime-fraud
exception applied to the documents and testimony.  ECF No. 216.
The Government claimed that, to the extent any of the documents
and testimony fell within the scope of the attorney-client
privilege, attorney work product privilege, or any other
privilege, there was a sufficient basis to hold an in camera
review of the documents and testimony to determine whether the
crime-fraud exception to the privilege applied.  See id.  The
Government further argued that Defendants and their counsel
should be excluded from any in camera hearing, because Judge
Surrick, who presided over the grand jury proceedings, had
excluded Defendants from in camera reviews for the purpose of
evaluating the applicability of the crime-fraud exception during
the grand jury investigation.

After finding that the Government had met the
standards articulated by the Supreme Court in Zolin to hold an
in camera review of the documents and testimony, the Court
conducted an in camera review of the Chartwell Documents, and
held two hearings, portions of which were also in camera, at
which the three attorney witnesses testified.  See Zolin, 491
U.S. at 568-69 (permitting district courts to conduct an in
camera review of documents to assess the applicability of the

crime-fraud exception).[4]  Following the _in camera_ review of the

Chartwell Documents, the Court found that portions of the

documents were protected by the attorney-client privilege, but

that they fell within the crime-fraud exception.  The Court

ordered Chartwell to produce the documents on October 11, 2017.

ECF No. 257.

      The Court held a hearing on October 12, 2017, at which

Verbonitz, Dubrow, and Mathewson testified.  During the hearing,

the Court permitted the Government to ask Verbonitz and Dubrow

questions, with counsel for Hallinan asserting objections to the

testimony on the basis of attorney-client privilege.[5]  For each

question for which counsel for Hallinan asserted a privilege,

the witness was instructed not to answer.  The Court then

conducted an _ex parte_, _in camera_ hearing (without the Government

present), asking each witness the questions that they had

previously not answered on the basis of privilege.

      With respect to Mathewson, who never represented

Hallinan personally, the Court allowed the Government to ask

questions about the applicability and scope of the community-of-

---

[4]     The Court did not exclude Defendants and their counsel
from the hearings, as the Government requested.  During the
grand jury investigation, the presence of Defendants and their
counsel would have destroyed the secrecy of the investigation.
At trial, there was no such concern.

[5]     Neff waived any privilege objection with respect to
the documents and testimony during the grand jury investigation.

interest privilege, but did not allow the Government to proceed with substantive questions about her conversations with Hallinan and his attorneys. Instead, the Court instructed the parties to file supplemental submissions regarding whether a community-of-interest privilege existed between Hallinan and Apex 1, and whether, if the privilege existed, there was a sufficient basis to hold an in camera hearing pursuant to Zolin to determine whether the crime-fraud exception applied.

Following the October 12, 2017, hearing, and on the basis of Mathewson's testimony, the Court concluded that Apex 1 and Hallinan had met their burden to establish the existence of a community-of-interest privilege with respect to certain communications between Mathewson and Hallinan's attorneys. Accordingly, the Court scheduled a Zolin hearing for October 25, 2017, at which time Hallinan could assert any objections to Mathewson's testimony on the basis of the community-of-interest privilege. ECF No. 267.

The Government filed a post-hearing submission regarding Mathewson on October 16, 2017, arguing that there was no community-of-interest privilege between Hallinan and Apex 1, but if even there was, the crime-fraud exception applied. ECF No. 261. In response, Apex 1 filed a motion to intervene in this action to assert the attorney-client privilege, attorney work product privilege, and/or the community-of-interest

privilege on its own behalf with respect to Mathewson's testimony.  ECF No. 264.  Apex 1 also argued that the crime-fraud exception did not apply to any of the privileged testimony.  See id.

At the Zolin hearing held on October 25, 2017, the Court granted Apex 1's motion to intervene for the purpose of asserting privilege objections to Mathewson's testimony. Hallinan and Apex 1 then objected to all of the Government's questions.[6]  The Court then conducted an ex parte, in camera hearing (without the Government present), at which it asked Mathewson the questions that she had previously refused to answer on the basis of privilege.

Following the Zolin hearings on October 12 and 25, 2017, the Court reviewed the transcript of the testimony of each

---

[6]     During the hearing, counsel for Hallinan also asserted an objection to the hearing itself, on the basis that the Government had not met its burden under Zolin to demonstrate that there was "'a factual basis adequate to support a good faith belief by a reasonable person' that in camera review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies."  Zolin, 491 U.S. at 572 (internal citation omitted) (quoting Caldwell v. District Court, 644 P.2d 26, 33 (Colo. 1982)).  At the hearing, the Court found that the Government had met its burden to demonstrate that a Zolin hearing was warranted on the basis that Apex 1 was a defunct corporation with no assets, and that it was asserting a privilege, at least in part, to the benefit of Hallinan, who was in turn paying the fees of Apex 1's counsel.  See Hr'g Tr. at 59:22-60:7, Oct. 25, 2017.  The Court noted that, although the assertion of a privilege is legitimate and recognized, if that privilege has been asserted for the corrupt purpose of obstructing justice, then the crime-fraud exception would apply. See id. at 60:7-10.

attorney witness in order to determine whether the answers are protected by the attorney-client, attorney work product, or community-of-interest privileges, and if so, whether the crime-fraud exception applies.  The Court then issued orders dated October 23, 2017, and October 30, 2017, sustaining in part and overruling in part Hallinan and Apex 1's objections.


**III. LEGAL STANDARDS**

    A.    <u>The Attorney-Client Privilege and the Attorney Work Product Doctrine</u>

        The attorney-client privilege applies to any communication that is "(1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client." <u>In re Teleglobe Commc'ns Corp.</u>, 493 F.3d 345, 359 (3d Cir. 2007) (quoting Restatement (Third) of the Law Governing Lawyers § 68 (2000)).  In order to establish that the attorney-client privilege protects a particular communication from disclosure, the proponent of the privilege must establish that:

        (1) the asserted holder of the privilege is or sought to become a client;

        (2) the person to whom the communication was made (a) is a member of the bar of a court, or his or her subordinate, and (b) in connection with this communication is acting as a lawyer;

        (3) the communication relates to a fact of which the attorney was informed (a) by his

12

> client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion of law or (ii) legal services or (iii) assistance in some legal proceeding, and (d) not for the purpose of committing a crime or tort; and
>
> (4) the privilege has been (a) claimed and (b) not waived by the client.

Rhone-Poulenc Rorer Inc. v. Home Indem. Co., 32 F.3d 851, 862 (3d Cir. 1994).

The attorney work product privilege, in turn, "preserves the confidentiality of legal communications prepared in anticipation of litigation." In re Grand Jury Matter #3, 847 F.3d 157, 165 (3d Cir. 2017). The work product doctrine applies to "documents and tangible things . . . prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) . . . ." In re Cendant Corp. Sec. Litig., 343 F.3d 658, 662 (3d Cir. 2003) (quoting Fed. R. Civ. P. 26(b)(3)).

Unlike the attorney-client privilege, the work product doctrine does not provide absolute protection against disclosure. A court may order the production of attorney work product upon a party's showing "that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii). However, if a court orders

disclosure, it "must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Id.

## B. The Community-of-Interest Privilege

There are two separate privileges that allow co-defendants and their attorneys to share information without waiving the attorney-client privilege. The "common interest" or "co-client" privilege applies where two or more clients are jointly represented by the same attorney. In that circumstance, "a communication of either co-client that . . . relates to matters of common interest is privileged as against third persons." In re Teleglobe Commc'ns Corp., 493 F.3d at 366 (emphasis omitted) (quoting Restatement (Third) of the Law Governing Lawyers § 75(1)). Importantly, "because co-clients agree to share all information related to the matter of common interest with each other and to employ the same attorney, their legal interests must be identical (or nearly so) in order that an attorney can represent them all with the candor, vigor, and loyalty that our ethics require." Id.

The "community-of-interest" or "joint-defense" privilege, on the other hand, applies where co-defendants are represented by different attorneys, and "allows attorneys

14

representing different clients with similar legal interests to share information without having to disclose it to others." Id. at 364. Under community-of-interest privilege, "[i]f two or more clients with a common interest in a litigated or nonlitigated matter are represented by separate lawyers and they agree to exchange information concerning the matter, a communication of any such client . . . is privileged as against third persons." Id. at 366 (emphasis omitted) (quoting Restatement (Third) of the Law Governing Lawyers § 76(1)). The privilege applies in civil and criminal litigation, and even in purely transactional contexts. Id. at 364. Unlike in the co-client context, because the clients involved in the community-of-interest have separate attorneys, courts "can afford to relax the degree to which clients' interests must converge without worrying that their attorneys' ability to represent them zealously and single-mindedly will suffer." Id. at 366.

   C.   The Crime-Fraud Exception

        The crime-fraud exception to the attorney-client privilege and the attorney work product privilege applies where "there is a reasonable basis to suspect (1) that the privilege holder was committing or intending to commit a crime or fraud, and (2) that the attorney-client communications or attorney work

product was used in furtherance of that alleged crime or fraud."
In re Grand Jury (ABC Corp.), 705 F.3d 133, 155 (3d Cir. 2012).

The Third Circuit has explained that "[t]he reasonable
basis standard 'is intended to be reasonably demanding; neither
speculation nor evidence that shows only a distant likelihood of
corruption is enough.'" Id. at 153 (quoting In re Grand Jury
Proceedings, 417 F.3d 18, 23 (1st Cir. 2005)). However, "the
party opposing the privilege is not required to introduce
evidence sufficient to support a verdict of crime or fraud or
even to show that it is more likely than not that the crime or
fraud occurred." Id. at 153-154. Instead, the party must make
a prima facie showing that there is "some foundation in fact"
for the applicability of the crime fraud exception. Id. at 151-
52 (quoting Clark v. United States, 289 U.S. 1, 15 (1933)). A
party meets this burden through the "presentation of evidence
which, if believed by the fact-finder, would be sufficient to
support a finding that the elements of the crime-fraud exception
were met." Id. at 152 (quoting In re Grand Jury Subpoena, 223
F.3d 213, 217 (3d Cir. 2000)).

In order to determine whether the crime-fraud
exception applies to particular documents or testimony, a court
may conduct an in camera hearing. To obtain an in camera
hearing, the party seeking disclosure must first demonstrate
that there is "'a factual basis adequate to support a good faith

16

belief by a reasonable person' that <u>in camera</u> review of the
materials may reveal evidence to establish the claim that the
crime-fraud exception applies." <u>Zolin</u>, 491 U.S. at 572
(internal citation omitted) (quoting <u>Caldwell</u>, 644 P.2d at 33).


**IV.   DISCUSSION**

      Defendants raised objections to four categories of
evidence the Government sought to introduce at trial: (1) the
Chartwell Documents; (2) the testimony of Kenneth Dubrow;
(3) the testimony of Susan Verbonitz; and (4) the testimony of
Lisa Mathewson.  In addition, Apex 1 filed a motion to intervene
to assert certain privileges with respect to Ms. Mathewson's
testimony.


      A.   <u>The Chartwell Documents</u>

      The Chartwell Documents are emails that include
communications between Hallinan and his attorney, Dubrow, or
among Hallinan, Dubrow, and Hallinan's co-defendant and
attorney, Neff.  Those communications all request or provide
legal advice to Hallinan, the client, regarding the Indiana
Litigation, and therefore are protected by the attorney-client
privilege.  A small number of the Chartwell Documents are email
exchanges that contain both attorney-client communications and
communications with third parties.  To the extent that portions

17

of the Chartwell Documents contain communications with third

parties, those portions of the documents are not privileged.

However, the remaining portions of the documents are privileged.

Having determined that all of the Chartwell Documents

are protected by the attorney-client privilege in whole or in

part, the Court next analyzed whether the crime-fraud exception

applied to those documents.

The Third Circuit, in an earlier proceeding in this

case, found that there was a reasonable basis to suspect that

Hallinan was committing or intending to commit a crime or fraud

with respect to the Indiana Litigation.[7]  See In re Grand Jury

Matter #3, 847 F.3d at 165-67.  The Third Circuit explained:

> The Government can readily satisfy the first
> requirement.  Though ultimately it will be
> up to a jury to determine whether [Hallinan]
> committed fraud, there is at least a
> reasonable basis to believe he did.  Even
> setting aside the email, the Government has
> a recording where [Hallinan] allegedly brags
> about defrauding the class action plaintiffs
> in the Indiana suit.  He purportedly admits
> in that recording to telling his associate—

---

[7]     During the grand jury investigation prior to
Defendants' indictment in this case, the Government challenged
Hallinan's assertions of privilege over certain communications
between Hallinan and Neff.  The grand jury court found that one
of the communications, a July 12, 2013 email in which Neff
advised Hallinan of his potential personal liability in the
Indiana Litigation, was protected by the work product privilege,
but that the crime-fraud exception applied, and allowed the
Government to show the email to the grand jury.  Hallinan filed
an interlocutory appeal, and the Third Circuit reversed.  See In
re Grand Jury Matter #3, 847 F.3d at 165-67.

> the same one who was supposed to have
> already purchased [Apex 1]—"I'll pay you ten
> grand a month if you will step up to the
> plate and say that you [own the company] and
> upon the successful completion of the
> lawsuit [I'll] give you fifty grand."

Id. at 165-66.

However, with respect to the particular document at issue – an email in which Neff gave Hallinan advice regarding the Indiana Litigation - the Third Circuit found that the second element of the crime-fraud exception was not satisfied, because there was no evidence Hallinan ever took the steps proposed in the attorney work product,[8] and therefore no evidence that he used the attorney work product in furtherance of the alleged crime or fraud.[9]  See id. at 166.  The Third Circuit explained that the second requirement of the crime-fraud exception is akin

---

[8]     In the version of the document that the Government obtained, Hallinan had forwarded the email to his accountant, waiving the attorney-client privilege.  See id. at 165. However, the document still retained its work-product status because it was used to prepare for Hallinan's case against those suing him.  See id.  Therefore, the Third Circuit focused solely on the attorney work product privilege, and not the attorney-client privilege.

[9]     Although the Third Circuit found that the crime-fraud exception did not apply to the July 12, 2013 email, the Court later permitted the Government to introduce the email at trial because there was a reasonable basis to suspect that Hallinan used the advice in the email in furtherance of a different crime or fraud.  See ECF No. 203.  Specifically, following a hearing held prior to trial, the Court found that there was a reasonable basis to suspect that Defendants were committing or intending to commit tax crimes, and that the July 12, 2013 email was used in furtherance of those crimes.  See id. at 2 n.2.

to the "overt act" requirement in the conspiracy context, and exists to "make sure that we are not punishing someone for merely thinking about committing a bad act."  Id.

Here, the Government contended that Hallinan falsely represented to the Indiana Plaintiffs that he did not own Apex 1, or have any relationship to that company after its purported sale to Ginger, in order to avoid responsibility for Apex 1's liability in the Indiana Litigation.  As the Third Circuit previously concluded, there is at least a reasonable basis to suspect that Hallinan was committing or intending to commit the crime or fraud alleged based upon the recording in which Hallinan discusses the Indiana Litigation and states that he offered to pay Ginger to claim that he owned Apex 1.

With respect to the second prong of the crime-fraud test, the Government asserted that Hallinan defrauded the Indiana Plaintiffs by lying at his deposition in the Indiana Litigation, and that any advice provided by his counsel in the communications at issue was used in furtherance of Hallinan's alleged fraud.  Based upon the July 12, 2013 email, in which Neff provided information to Hallinan regarding Hallinan's potential liability in the Indiana Litigation through the piercing of the corporate veil with respect to Apex 1, and Hallinan's subsequent deposition testimony in that case disavowing any ownership interest in Apex 1, there is a

reasonable basis to suspect that Hallinan retained counsel in the Indiana Litigation in order to escape personal liability by misrepresenting his ownership of Apex 1. Hallinan was not named as a party in the Indiana Litigation. Therefore, there is a reasonable basis to suspect that the sole purpose of Hallinan's retention of counsel to represent his interests in the Indiana Litigation, and solicitation of the advice of counsel with respect to that lawsuit, was to avoid potential liability through fraud.

In that manner, all of the advice that Hallinan received from Dubrow in the Indiana Litigation was "used in furtherance of [the] alleged crime or fraud." ABC Corp., 705 F.3d at 155. Therefore, all of Hallinan's communications with Dubrow relating to the Indiana Litigation fall within the crime-fraud exception to the attorney-client privilege, including the Chartwell Documents.

The documents at issue here differ from the Third Circuit's consideration of the July 12, 2013 email in In re Grand Jury Matter #3, 847 F.3d 157, in two important respects. First, in In re Grand Jury Matter #3, the Third Circuit found that there was no evidence that Hallinan completed the crime identified by the Government – amending his prior tax returns to omit or misstate his ownership of Apex 1 - after receiving the July 12, 2013 email. Here, however, the Government alleges that

Hallinan committed a different crime: defrauding the Indiana Plaintiffs by lying at his deposition in order to convince them that he did not have any managerial control over Apex 1. Although there was no evidence that Hallinan completed the tax fraud, there is evidence that Hallinan completed the fraud against the Indiana Plaintiffs by lying at his deposition.

Second, also unlike in In re Grand Jury Matter #3, there is a reasonable basis to suspect that Hallinan began the crime or fraud prior to soliciting the advice of the Chartwell attorney, and therefore the advice was sought in furtherance of the crime or fraud. Here, all of the communications at issue post-date Hallinan's awareness of his potential liability in the Indiana Litigation pursuant to the veil-piercing doctrine, which he learned of no later than July 12, 2013. Therefore, there is a reasonable basis to suspect that Hallinan's entire act of retaining counsel and soliciting legal advice was in furtherance of his alleged crime or fraud.

B.   Testimony of Kenneth Dubrow

Prior to the ex parte, in camera portion of the October 12, 2017, hearing, Dubrow testified that he represented Hallinan personally in the Indiana Litigation. See Hr'g Tr. 142:23-25, 143:1, Oct. 12, 2017. According to Dubrow, the representation began in January 2014, about a month prior to

22

Hallinan's deposition, and ended in approximately July 2014, when the lawsuit was settled. See id. at 143:2-25; 144:1-10. On the basis of that testimony, the Government conceded that an attorney-client relationship existed starting in January 2014 and continuing until July 2014. See id. at 148:10-17.

During Dubrow's testimony at the hearing, Hallinan objected to sixteen questions posed by the Government on the basis of the attorney-client privilege, and the Court instructed Dubrow not to answer those questions. After the Government left the hearing, however, the Court posed all sixteen of those questions to Dubrow, and permitted him to answer.

Upon consideration of Dubrow's ex parte, in camera testimony, the Court found that all of Dubrow's responses to the sixteen questions are protected by the attorney-client privilege, but that the crime-fraud exception applies to all of Dubrow's answers. As explained above, the July 12, 2013 email provides a reasonable basis to suspect that Hallinan retained counsel in the Indiana Litigation for the purpose of furthering his intended fraud: concealing his true ownership and control of Apex 1, so that the Indiana Plaintiffs would settle their claims against the company for a smaller amount.

Based on Dubrow's testimony, Hallinan used Dubrow in furtherance of this fraud by representing to Dubrow that he did not own Apex 1, that he did not have any documents related to

Apex 1, and that his testimony at his deposition in the Indiana Litigation was truthful.  Therefore, there is a reasonable basis to suspect that Hallinan used Dubrow's advice in furtherance of his fraud, and that the crime-fraud exception to the attorney-client privilege applies to Dubrow's entire representation of Hallinan in the Indiana Litigation.  As a result, the Court allowed the Government to ask Dubrow all sixteen challenged questions at trial.


C.   Testimony of Susan Verbonitz

During the initial portion of Verbonitz's testimony, prior to the portion of the hearing held in camera, Verbonitz testified that she represented Apex 1 in the Indiana Litigation from May 17, 2010, through October 9, 2013.  See Hr'g Tr. 78:9-20, Oct. 12, 2017.

Verbonitz testified that she did not represent Hallinan personally during the Indiana Litigation.  See id. at 79:11-19.  However, she also testified that (1) she previously represented Hallinan on a personal basis on other matters; (2) Hallinan was her primary contact for Apex 1 during the Indiana Litigation; (3) Hallinan's companies paid her legal bills for her representation of Apex 1 in the Indiana Litigation; (4) she provided advice to Hallinan regarding the potential for personal, managerial liability against him in the

Indiana Litigation; and (5) she authored a letter to Hallinan providing legal advice to Apex 1 that stated "Confidential – Subject to Attorney-Client Privilege." See id. at 80:10-87:12. Verbonitz admitted that based on those facts, Hallinan may have reached an understanding in his mind that Verbonitz was acting as his attorney. See id. at 86:25-87:12.

Counsel for Hallinan objected to seven questions posed by the Government on the basis of the attorney-client privilege created by Hallinan's perception of the attorney-client relationship. Upon hearing Verbonitz's answers to the questions, Hallinan withdrew his attorney-client privilege objection to the first four questions. Therefore, the Court allowed the Government to ask those four questions at trial.

The Court then reviewed the transcript of Verbonitz's answers in order to determine the applicability of the crime-fraud exception to the three remaining questions, and determined that the crime-fraud exception did not apply to Verbonitz's testimony.

Unlike Dubrow's representation of Hallinan, the majority of Verbonitz's representation of Apex 1 in the Indiana Litigation occurred prior to the July 12, 2013 email. Therefore, the July 12, 2013 email does not provide a reasonable basis to suspect that Hallinan used Verbonitz's representation in furtherance of the alleged crime or fraud of defrauding the

Indiana Plaintiffs, as it did for Dubrow's representation. Based on the Court's review of Verbonitz's ex parte, in camera testimony, the testimony did not provide any other reasonable basis to suspect that Verbonitz's representation was used in furtherance of Hallinan's alleged crime or fraud.[10]

### D. Testimony of Lisa Mathewson

At the October 12, 2017, hearing, Mathewson testified that she represented Apex 1, and never met Hallinan. See Hr'g Tr. 17:17-19, 22:15-17, 43:2-3, Oct. 12, 2017. She testified that the initial scope of her representation was to assert Apex 1's attorney-client privilege in connection with grand jury subpoenas sent to Weir and Chartwell. See id. at 17:20-18:1. Her representation later expanded to include asserting Apex 1's attorney-client privilege in connection with grand jury subpoenas for the testimony of Verbonitz, Dubrow, and Mathewson herself, as well as a subpoena for documents issued to Mathewson's law firm. See id. at 18:8-19:25.

As Mathewson did not represent Hallinan personally, the only privilege Hallinan could assert over Mathewson's testimony would be the community-of-interest privilege. In order for Mathewson's communications with Hallinan's attorneys

---

[10]    As the Court has concluded that Verbonitz's testimony is protected by the attorney-client privilege, the Court will refrain from recounting the details of the testimony.

to be protected by the community-of-interest privilege, there must be evidence that (1) Mathewson "agree[d] to exchange information" with Hallinan's attorneys; (2) concerning a "litigated or nonlitigated matter"; (3) in which Apex 1 and Hallinan had a "common interest."  In re Teleglobe Commc'ns Corp., 493 F.3d at 366 (quoting Restatement (Third) of the Law Governing Lawyers § 76(1)).

Mathewson testified that she agreed to exchange information with Hallinan's attorneys with respect to the Indiana Litigation, and that she did in fact exchange information.  Apex 1 and Hallinan both had a common interest, during the grand jury investigation, in defending against any potential charges against either of them relating to the Indiana Litigation.  Although, ultimately, Apex 1 was not charged, it was a subject of the investigation.  Therefore, Apex 1 and Hallinan have established a community-of-interest privilege with respect to certain communications between Mathewson and Hallinan's attorneys.

During the October 25, 2017, hearing, Hallinan asserted the community-of-interest privilege with respect to all seventeen of the Government's questions.  Apex 1 asserted the attorney-client privilege, the attorney work product privilege, and/or the community-of-interest privilege with respect to all seventeen questions.

Although Hallinan and Apex 1 objected to all of the
Government's questions on the basis of privilege, two of the
seventeen questions, as well as subparts of two other questions,
do not call for privileged testimony.  Those questions and
subparts ask Mathewson to testify regarding (1) the identity and
authority of Apex 1's authorized representative, including
whether Mathewson believes Ginger is authorized to assert or
waive privileges on behalf of Apex 1; and (2) the payment of
Apex 1's legal fees, including the amount of the fees and the
identity of the person or entity paying the fees.  The identity
of a corporate client's authorized representative is not
privileged information.  Nor is information regarding legal fees
and billing.  As those topics are not privileged, the Court
permitted the Government to ask Mathewson questions regarding
those topics.  See ECF No. 283.

The remaining questions the Government asked call for
testimony regarding Mathewson's beliefs about the ownership of
Apex 1, and Mathewson's conversations with counsel for Hallinan
and Neff on a variety of topics relating to Apex 1's ownership
and assertions of privilege.  Those questions are subject to
Hallinan's community-of-interest privilege, Apex 1's attorney
client privilege and community-of-interest privilege, and/or the
attorney work product privilege.  Therefore, the testimony would

not have been admissible at trial unless it fell within the crime-fraud exception.

In its October 13, 2017, submission regarding Mathewson's testimony, the Government argued that the crime-fraud exception applied to any of Mathewson's testimony that the Court determined was privileged.  See Gov't Submission, ECF No. 261.  The Government asserted that there was a reasonable basis to suspect that Hallinan was committing or intending to commit the uncharged crime of obstruction of justice by limiting the Government's access to documents and testimony regarding the true ownership of Apex 1.  See id. at 6.  The Government then argued that there was a reasonable basis to suspect that Hallinan used his attorneys' communications with Mathewson in furtherance of the obstruction of justice, because he hired Mathewson for the sole purpose of invoking Apex 1's attorney-client privilege to block the Government's access to information that would reveal the prior fraud he committed with respect to the Indiana Litigation.  See id.

In response, Apex 1 argued that (1) there is no legal basis for the Government's contention that the valid assertion of an attorney-client privilege is an obstruction of justice; (2) neither Hallinan nor his counsel urged Mathewson to assert Apex 1's privilege or conditioned the payment of fees on any particular course of action; and (3) the community-of-interest

privilege cannot be voided by the crime-fraud exception unless both clients intended to misuse the community-of-interest arrangement to further the crime or fraud.  See Apex Mot. to Intervene, ECF No. 264.

Prior to the October 25, 2017, hearing, the Court had concluded that there was "'a factual basis adequate to support a good faith belief by a reasonable person' that in camera review" of Mathewson's testimony "may reveal evidence to establish the claim that the crime-fraud exception applies."  Zolin, 491 U.S. at 572 (internal citation omitted) (quoting Caldwell, 644 P.2d at 33).  However, Mathewson's ex parte, in camera testimony ultimately did not reveal such evidence.

Based upon Mathewson's testimony, there is no evidence, aside from the Government's speculation, that Apex 1's assertions of privilege were not legitimate.  Apex 1, as a subject of the grand jury investigation, had an interest in keeping the corporation's privileged communications with its attorneys private, and an interest in keeping the communications between Apex 1's attorneys and Hallinan's attorneys private as well.  Although there is a reasonable basis to suspect that Hallinan may have desired, or even attempted, to influence Mathewson's assertions of privilege on behalf of Apex 1, there is insufficient evidence that he actually did so, aside from the mere fact that Apex 1 has asserted privilege.

Mathewson testified at length during the _in camera_, _ex parte_ hearing regarding her communications with Hallinan's attorneys, and that testimony does not support a finding that they, or Hallinan, influenced her assertions of privilege on behalf of Apex 1.  Therefore, even if there is a reasonable basis to suspect that Hallinan intended to commit obstruction of justice by convincing Mathewson to assert privileges on behalf of Apex 1, there is no evidence that he was able to use his attorneys' communications with Mathewson in furtherance of that crime.  As a result, the crime-fraud exception does not apply to Mathewson's privileged testimony.[11]

## V.    CONCLUSION

For the reasons stated above, Hallinan and Apex 1's objections to the admission of the documents and testimony on the basis of privilege were sustained in part and overruled in part.  Defendants' objections to the fifteen Chartwell Documents and the testimony of Kenneth Dubrow on the basis of the attorney-client privilege were overruled, and the Government was permitted to introduce those documents and testimony at trial.  Hallinan's objections to the testimony of Susan Verbonitz, and Hallinan and Apex 1's objections to the testimony of Lisa

---

[11]    Ultimately, Mathewson was not called as a witness at trial by either the Government or Defendants.

Mathewson, were sustained, except with respect to two questions and two subparts that are not protected by any privilege.  The Court did not permit the Government to ask Ms. Verbonitz any of the questions subject to Hallinan's objections.  The Court also did not permit the Government to ask Ms. Mathewson the questions that are protected by privilege.