IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | NO. 16-130-01 |
| v. | : | |
| | : | |
| CHARLES M. HALLINAN | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                                June 27, 2018


        Following a jury trial, Defendant Charles M. Hallinan
was convicted of conspiracy to violate the Racketeer Influenced
and Corrupt Organization ("RICO") Act, conspiracy to commit
fraud, mail fraud, wire fraud, and money laundering.  The
Government now seeks to forfeit Hallinan's alleged proceeds of
the RICO conspiracy and twenty-two specific properties pursuant
to 18 U.S.C. § 1963(a).  Hallinan contests both the Government's
proposed forfeiture money judgment amount and the forfeiture of
the individual properties.  The Court held a hearing pursuant to
Federal Rule of Criminal Procedure 32.2(b)(1)(B), and is now
ready to issue a preliminary order of forfeiture.  This
memorandum constitutes the Court's findings of fact and
conclusions of law in support of the preliminary order of
forfeiture.

For the reasons that follow, the Court finds that the Government is entitled to the forfeiture of (1) $65,339,327 as proceeds of the RICO conspiracy charged in Counts One and Two of the Superseding Indictment pursuant to 18 U.S.C. § 1963(a)(3); (2) $90,000 as property involved in the commission of the offenses charged in Counts Nine through Seventeen of the Superseding Indictment pursuant to 18 U.S.C. § 982(a)(1); (3) Hallinan's right, title and interest in twenty-one properties as property that is an interest in the RICO enterprise, pursuant to 18 U.S.C. § 1963(a)(2)(A); and (4) Hallinan's right, title and interest in an apartment located in Boca Raton, Florida, as property that afforded a source of influence over the RICO enterprise pursuant to 18 U.S.C. § 1963(a)(2)(D).

I.   **PROCEDURAL HISTORY**

On March 31, 2016, Hallinan was indicted by a grand jury on two counts of conspiracy to violate the RICO Act in violation of 18 U.S.C. § 1962(d), one count of conspiracy to commit fraud, in violation of 18 U.S.C. § 371, two counts of mail fraud and aiding and abetting mail fraud, in violation of 18 U.S.C. §§ 1341 and 2, three counts of wire fraud and aiding and abetting wire fraud, in violation of 18 U.S.C. §§ 1343 and 2, and nine counts of money laundering, in violation of 18

U.S.C. § 1956(a)(2).  ECF No. 1.  Hallinan's co-defendant

Randall P. Ginger was indicted on the same charges, and

Hallinan's co-defendant Wheeler K. Neff was indicted on all of

the same charges except money laundering.  See id.  A second

grand jury was later empaneled and returned a superseding

indictment on December 1, 2016.  ECF No. 87.

Hallinan and Neff filed a motion to dismiss the

charges against them on February 8, 2017, ECF No. 149, which the

Court denied on August 15, 2017, ECF No. 203.  A jury trial

commenced on September 26, 2017, against Hallinan and Neff.[1]

On November 27, 2017, the jury returned a guilty

verdict against both Defendants on all counts of the superseding

indictment.  On December 4, 2017, on the basis of Hallinan's

conviction, the Government filed a motion for a preliminary

order of forfeiture and proposed findings of fact and

conclusions of law in support of the proposed order.  ECF No.

326.  On December 8, 2017, Hallinan filed a response to the

Government's motion for a preliminary order of forfeiture,

including Hallinan's alternate proposed findings of fact and

conclusions of law.  ECF No. 328.

On December 12, 2017, the Court ordered the Government

to file a reply in further support of its motion for a

---

[1]     Defendant Ginger did not appear for trial.  He is
reportedly currently living in Canada.

preliminary order of forfeiture and proposed findings of fact and conclusions of law, see ECF No. 338, which the Government filed on January 10, 2018, ECF No. 342.  The Court also permitted Hallinan to file a sur-reply to the Government's motion, see ECF No. 338, which Hallinan filed on January 31, 2018, ECF No. 356.  On April 6 and April 25, 2018, the Court held a hearing on the Government's motion for a preliminary order of forfeiture.  ECF No. 384.

The Court has reviewed the relevant trial testimony and exhibits, the parties' proposed findings of fact and conclusions of law, the parties' memoranda in support of their proposed findings of fact and conclusions of law and the responses and replies thereto, the arguments made at the forfeiture hearing held on April 6 and April 25, 2018, and the exhibits introduced at that hearing.  Upon this record, as well as credibility findings, the Court makes its findings of fact and conclusions of law.

## II.  FINDINGS OF FACT

1.  The Government properly signaled its intent to seek a forfeiture judgment as part of the punishment in this case through its filing of three notices of forfeiture, as well as a Bill of Particulars.  See ECF No. 87 at 47-54; ECF No. 158; ECF No. 202; ECF No. 253.

2.     The evidence at trial proved that Hallinan established, operated, controlled, and conducted the Hallinan Payday Lending Enterprise charged in Count One of the Superseding Indictment ("the HPDLE").  See Gov't Exs. 1-8, 30-50, 61-76, 81-85, 99-115, 120-158, 161-66, 168-200, 232, 236, 238, 241-296, 317-355, 337-425, 477-471, 501-03, 506-08, 511-12, 514-19, 521-529, 531-37, 541-82, 585-87, 591-95, 600-02, 607-08, 650-56, 665-69, 671-77, 685, 695-96, 698-700, 703-727, 731-42, 748-54, 756-57, 759, 761, 763, 766, 768, 700, 772-78, 780-81, 791-94, 799, 801-48, 850-87, 878-82, 884, 886, 889, 892-93, 898-903, 911-24, 927-33, 936, 941, 943, 945-46, 948-49, 951-92, 976, 984-85, 989-91, 995, 997-98, 1000.

3.     The evidence at trial proved that the HPDLE received $490,904,533 in gross receipts during the course of the conspiracy charged in Count One, as calculated from the information provided by Intercept, the third party company which processed the disbursements and payments for the loans extended by the HPDLE.  See Gov't Exs. 500A-D, 500E.

4.     The evidence at trial proved that the HPDLE also received $2,226,857 in gross receipts during the course of the conspiracy charged in Count One, as calculated from information provided by PowerPay, another third party company which processed the disbursements and payments for the loans extended by the HPDLE.

5.     Hallinan did not own or operate the Rubin Payday Pending Enterprise charged in Count Two of the Superseding Indictment ("the RPDLE").  However, Hallinan participated in the conduct of the RPDLE by assisting it with the brokering of relationships with Indiana tribes, so that the RPDLE could enter into sham relationships with those tribes.  In connection with this assistance, Adrian Rubin paid Hallinan $100,000.

6.     Therefore, the total amount of the gross receipts received by Hallinan in connection with the RICO conspiracies charged in Counts One and Two is $493,431,390.

7.     The evidence at trial established the Hallinan paid Ginger a total of $90,000 in nine payments to assist in the fraud related to the Indiana Litigation, as charged in Counts Nine through Seventeen of the Superseding Indictment.  See Gov't Exs. 100A, 317-335.

8.     As alleged in the Superseding Indictment and as proven at trial, the HPDLE was a RICO enterprise which included, but was not limited to, the following entities:[2]

---

[2]     Hallinan does not challenge the Government's proposed finding of fact that these entities are part of the HPDLE with the exception of Hallinan Capital Corp. ("HCC").  The parties' arguments regarding HCC are discussed below in the Court's conclusions of law.  For the reasons set forth below, the Court finds that HCC is part of the HPDLE.

a. TC Services Corp., d/b/a "Telecash" and "Tele-Ca$h" and formerly known as "Tele-Ca$h" and "RAC" ("TC Services");

b. CRA Services, d/b/a "Cashnet" ("CRA Services");

c. Main Street Services Corp. d/b/a "Easy Cash" ("Main Street");

d. Tahoe Financial Advisors, d/b/a "Axcess Cash" ("Tahoe");

e. National Money Service, Inc., a/k/a "NMS, Inc.," which did business under multiple trade names ("NMS");

f. First East, Inc., d/b/a "Xtra Cash," d/b/a "Fast Funding First East," d/b/a "Payday Loan Direct" ("First East");

g. Cheyenne Servicing Corp. ("Cheyenne");

h. CR Services Corp. ("CR Services");

i. Apex 1 Processing, Inc., d/b/a "Paycheck Today," "Cash Advance Network," and "Instant Cash USA" ("Apex 1 Processing");

j. Cash Advance Network, Inc. ("CANI");

k. Instant Cash, USA, Inc. ("ICU");

l. Fifth Avenue Financial, Inc., d/b/a "My Next Paycheck" ("Fifth Avenue");

m.   Palmetto Financial, Inc., d/b/a "My Payday
     Advance" ("Palmetto");

n.   Sabal Financial, Inc., d/b/a "Your Fast
     Payday" ("Sabal");

o.   Tribal Lending Enterprises, Division A
     ("TLE-A");

p.   Micro Loan Management, Division A ("MLM-A");

q.   Sequoia Tribal Enterprises ("STE");

r.   Sequoia Tribal Management Services ("STMS");

s.   HL Funding, Inc. ("HL Funding");

t.   HL Services, Inc. ("HL Services");

u.   Blue Water Management Services, LLC ("Blue
     Water Management");

v.   Blue Water Funding Group ("Blue Water
     Funding");

w.   Hallinan Capital Corp. ("HCC");

x.   Mill Realty Management, LLC ("Mill Realty");

y.   Apex 1 Lead Generators, Inc., ("Apex 1 LG");
     and

z.   Clarity Services, Inc. ("Clarity").

9.   The Government seeks the forfeiture of twenty-one
properties it alleges are interests of the RICO enterprise
charged in Count One, as follows:

a.  All funds in account number 009418321146 in the name of Hallinan Capital Corp., at Bank of America ("Property 1");

b.  All funds in account number 6236347844 in the name of Hallinan Capital Corp., at Citizens Bank ("Property 2");

c.  All funds in account number 9943232101 in the name of Hallinan Capital Corp., at Vanguard ("Property 3");

d.  All funds in account number 6236347690 in the name of Apex 1 Lead Generators, at Citizens Bank ("Property 4");

e.  All funds in account number 6236347771 in the name of Blue Water Funding Group, LLC, at Citizens Bank ("Property 5");

f.  All funds in account number 6236347879 in the name of Mill Realty Management, LLC, at Citizens Bank ("Property 6");

g.  All funds in account number 88044257268 in the name of Apex 1 Processing, at Vanguard ("Property 7");

h.  All funds in account number 271501789868 in the name of Apex 1 Processing, Inc., d/b/a

Cash Advance Network, at Power Pay, EVO
Payments International ("Property 8");

i.    All funds in account number 271501796475 in
the name of Apex 1 Processing, Inc., d/b/a
Instant Cash USA, at Power Pay, EVO Payments
International ("Property 9");

j.    All funds in account number 271501796327 in
the name of Apex 1 Processing, Inc., d/b/a
Paycheck Today, at Power Pay, EVO Payments
International ("Property 10");

k.    All funds in account number 27150179590 in
the name of Fifth Avenue Financial, Inc.,
d/b/a My Next Paycheck, at Power Pay, EVO
Payments International ("Property 11");

l.    All funds in account number 271501796665 in
the name of Palmetto Financial, Inc., d/b/a
My Payday Advance, at Power Pay, EVO
Payments International ("Property 12");

m.    All funds in account number 271501796707 in
the name of Sabal Financial, Inc., d/b/a
Your Fast Payday, at Power Pay, EVO Payments
International ("Property 13");

n.   Funds in the amount of $92,587.23 in account number 623021206, in the name of Charles Hallinan, at Morgan Stanley ("Property 14");

o.   Funds in the amount of $58,461.62 in account number 009466692476, in the name of Charles Hallinan, at Bank of America ("Property 15");

p.   Funds in the amount of $20,665.75 in account number 009001408711, in the name of Charles Hallinan, at Bank of America ("Property 16");

q.   Funds in the amount of $100,930.00 in account number 7101622806, in the name of Charles M. Hallinan, at Bank of Leumi ("Property 17");

r.   Funds in the amount of $211,648.99 in account number 4300263160, in the name of Charles Hallinan, at TD Bank ("Property 18");

s.   One (1) 2014 Bentley Flying Spur bearing Vehicle Identification Number SCBEC9ZA7EC092360 ("Property 19");

t.    One (1) 2015 Mercedes Benz S550 bearing

Vehicle Identification Number

WDDUG8FB3FA123337 ("Property 20"); and

u.    One (1) 2015 Mercedes Benz S550V4, bearing

Vehicle Identification Number

WDDUG8FB3FA123322 ("Property 21").

10.    The Government also seeks forfeiture of 400 S.E. 5th Avenue, Apartment 304N, Boca Raton, Florida ("the Boca Raton Property"), which is a real property owned by Hallinan and his wife.[3]

11.    Hallinan listed the Boca Raton Property as the registered principal place of business and mailing address for Apex 1 Processing, Inc. and Mill Realty Management. See Gov't Exs. 121-24, 151-53, 161-63, 171-3, 178-79, 180-84, 193-95, 202-04, 207, 236, 2212.  Hallinan also used the Boca Raton Property as the business address for certain tax filings of Apex 1 Processing, Inc.

12.    In addition, while acting as the owner and operator of the HPDLE, Hallinan performed work in support of the HPDLE from the Boca Raton Property for several months each year. For example, Hallinan sent correspondence and emails on behalf

_____

[3]     The Court will adjudicate any issues relating to Hallinan's wife's ownership interest in the Boca Raton Property in an ancillary proceeding pursuant to Federal Rule of Criminal Procedure 32.2(c) in the event that she files a timely petition pursuant to Rule 32.2(c)(1).

of the HPDLE from the Boca Raton Property, and conducted

business over the telephone from the Boca Raton Property.

## III. CONCLUSIONS OF LAW

1.     Pursuant to Federal Rule of Criminal Procedure
32.2(a), a court cannot enter a judgment of forfeiture in a
criminal proceeding unless "the indictment or information
contains notice to the defendant that the government will seek
the forfeiture of property as part of any sentence in accordance
with the applicable statute."  Fed. R. Crim. P. 32.2(a).

2.     Here, the Government provided adequate notice to
Hallinan of the Government's intention to seek forfeiture in
this case for the convictions of Counts One, Two, and Nine
through Seventeen, including a money judgment, directly
forfeitable property, and substitute assets, through the notices
of forfeiture and the forfeiture Bills of Particular.

3.     It is the Government's burden to establish that
specific property is subject to forfeiture.  In the Third
Circuit, with respect to forfeiture related to RICO convictions,
in particular, the Government must prove the relationship
between the property interest to be forfeited and the RICO
violations beyond a reasonable doubt.[4]  United States v. Pelullo,

_____

[4]     During the forfeiture hearing, the Government argued
that it should be required to prove the relationship between the

13

14 F.3d 881, 906 (3d Cir. 1994) ("[W]e conclude that Congress intended the burden of proof in a 1963(a) proceeding to be beyond a reasonable doubt."); see also United States v. Voigt, 89 F.3d 1050, 1081-83 (3d Cir. 1996).

4.      For criminal forfeiture proceedings related to convictions for other crimes, including the money laundering crimes charged in Counts Nine through Seventeen of the Superseding Indictment, the Government must establish the relationship between the property interest to be forfeited and the criminal violations by a preponderance of the evidence. See United States v. Mullins, 613 F.3d 1273, 1295 (10th Cir. 2010) (explaining that the government bears the burden of proving by a preponderance of the evidence the amount of the proceeds for a money judgment); United States v. Vera, 278 F.3d 672, 673 (7th Cir. 2002) (explaining that "forfeiture of all property connected with the charged offenses" is "warranted upon a showing of a preponderance of the evidence").

5.      Following a trial, the Government may rely on evidence already in the record for a determination of forfeiture. Fed. R. Crim. P. 32.2(b)(1)(B). The parties may

property interest and the RICO violations by a preponderance of the evidence, as opposed to beyond a reasonable doubt. Although other circuits have embraced the preponderance standard, the Third Circuit has held that the appropriate standard of proof for RICO forfeiture pursuant to 18 U.S.C. § 1963 is beyond a reasonable doubt. See United States v. Pelullo, 14 F.3d 881, 906 (3d Cir. 1994).

offer additional evidence as well.  Fed. R. Crim. P.
32.2(b)(1)(B).

6.    In connection with a forfeiture proceeding
pursuant to 18 U.S.C. § 1963 a court "may receive and consider .
. . evidence and information that would be inadmissible under
the Federal Rules of Evidence."  The court may also receive and
consider inadmissible evidence in connection with the forfeiture
of property related to money laundering.  See 18 U.S.C.
§ 982(b)(1) (incorporating by reference 21 U.S.C. § 853(e)(3)).

7.    Here, the Government seeks to forfeit four
categories of property: (1) property constituting, or derived
from, any proceeds which Hallinan obtained, directly or
indirectly, from unlawful debt collection as charged in Counts
One and Two, pursuant to 18 U.S.C. § 1963(a)(3); (2) property
involved in the money laundering offense charged in Counts Nine
through Seventeen, pursuant to 18 U.S.C. § 982(a)(1);
(3) Hallinan's right, title and interest in twenty-one
properties as property that is an interest in the RICO
enterprise, pursuant to 18 U.S.C. § 1963(a)(2)(A); and
(4) Hallinan's right, title and interest in an apartment located
in Boca Raton, Florida, as property that afforded a source of
influence over the RICO enterprise pursuant to 18 U.S.C.
§ 1963(a)(2)(D).

A.    Forfeiture Pursuant to 18 U.S.C. § 1963(a)(3)

8.    Title 18 of the United States Code, Section 1963(a), provides that "[w]hoever violates any provision of [18 U.S.C. §] 1962 . . . . shall forfeit to the United States, irrespective of any provision of State law . . . any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from . . . unlawful debt collection in violation of [18 U.S.C. §] 1962."  18 U.S.C. § 1963(a)(3).

9.    The Government seeks to forfeit $493,341,390 as proceeds that Hallinan obtained from unlawful debt collection in violation of 18 U.S.C. § 1962, as charged in Counts One and Two of the Superseding Indictment.

a.    The Definition of "Proceeds"

10.    The RICO statute does not define the term "proceeds."  The Third Circuit has not addressed the meaning of the term in the context of 18 U.S.C. § 1963(a)(3), and the Supreme Court expressly declined to resolve the issue.  See Russello, 464 U.S. at 29 n.3 ("In our ruling today, we recognize that we have not resolved any ambiguity that might be inherent in the terms 'profits' and 'proceeds.'  Our use of those terms is not intended to suggest a particular means of calculating the

precise amount that is subject to RICO forfeiture in any given case.").

11.     When a term in a statute is undefined, courts give the word its ordinary meaning.  See Asgrow Seed Co. v. Winterboer, 513 U.S. 179, 187 (1995).  However, proceeds "can mean either 'receipts' or 'profits,'" and both meanings "are accepted, and have long been accepted, in ordinary usage." United States v. Santos, 553 U.S. 507, 511 (2008) (citing 12 Oxford English Dictionary 544 (2d ed. 1989); Random House Dictionary of the English Language 1542 (2d ed. 1987); Webster's New International Dictionary 1972 (2d ed. 1954)).

12.     Thus, under its ordinary meaning, proceeds could mean gross receipts (i.e., all revenue received), gross profits (i.e., all revenue received minus direct costs), or net profits (i.e., all revenue received minus all costs).

13.     The legislative history of RICO contains two discussions of the word "proceeds."  First, the Senate Report for the 1984 amendments to RICO, which added the term "proceeds," states that:

> To come within the scope of paragraph (3), the property must constitute, or be derived from, proceeds the defendant obtained through the racketeering activity involved in the RICO violation.  Thus, proceeds accruing to an enterprise or association involved in a RICO violation will be forfeitable only to the extent that they are derived from racketeering activity or

unlawful debt collection.  For example, if
only a part of the corporation's affairs
were conducted through a pattern of
racketeering activity, the gain produced
through this activity would be subject to
forfeiture but the legitimately produced
profits of the corporation would not.

S. Rep. No. 225, 98th Cong., 2d Sess. 199 (1984).

14.     The same report also explains why the term

"profits" was not used:

[T]he term "proceeds" has been used in lieu
of the term "profits" in order to alleviate
the unreasonable burden on the government of
proving net profits.  It should not be
necessary for the prosecutor to prove what
the defendant's overhead expenses were.

Id.

15.     These two portions of the Senate Report, taken

together, suggest that "proceeds," within the meaning of 18

U.S.C.§ 1963(a)(3), means "gain" but not "net profits."

16.     Here, the parties each advance different

definitions of the word "proceeds."

17.     The Government contends that "proceeds" means

gross receipts, that is, all of the money received by the RICO

enterprise as payment for unenforceable debts.  In order to

calculate that amount, the Government added all of the funds

deposited in all of the RICO enterprise accounts during the

duration of the RICO conspiracy.  According to the Government,

this total is $493,341,390.  The Government argues that it is

entitled to a money judgment in that amount.

18.     The Government concedes that the forfeiture
amount it seeks include the repayment of funds loaned out to
borrowers, but argues that the funds loaned out to borrowers
must be included in the RICO forfeiture because Hallinan funded
the loans with the proceeds of his illegal activity.  In other
words, according to the Government, because Hallinan reinvested
the money he received from borrowers (consisting of interest,
fees, and principal) by extending additional loans, the
Government is entitled to collect that reinvested money again
and again, each and every time it reappeared in the RICO
enterprise bank accounts.

19.     In support of its view, the Government primarily
relies on cases from the First, Eighth, and Ninth Circuits, all
of which found that "proceeds," as used in 18 U.S.C. § 1963(a),
means "gross receipts."[5]  See United States v. Christensen, 828
F.3d 763, 822-823 (9th Cir. 2015); United States v. Simmons, 154
F.3d 765, 770-71 (8th Cir. 1998); United States v. Hurley, 63
F.3d 1, 21 (1st Cir. 1998).  The Government also cites an
unpublished Third Circuit case holding that "proceeds" means
"gross receipts" in the context of a different statute, the

---

[5]     The Government claims that the District of Columbia
Circuit also adopted the "gross receipts" approach in United
States v. DeFries, 129 F.3d 1293 (D.C. Cir. 1997).  However, the
only question before the court in DeFries was whether taxes are
deductible from the total RICO forfeiture amount.  See id. at
1315.  The court held that taxes are not deductible (a point
that Hallinan does not challenge here).  See id.

19

Comprehensive Drug Abuse Prevention and Control Act, 21 U.S.C. § 853(a), see United States v. Heilman, 377 F. App'x 157 (3d Cir. 2010), and cases in which other circuits have held that "proceeds" means "gross proceeds" when the term is used in other criminal forfeiture statutes, including in drug and white collar forfeiture statutes.

20.    Hallinan argues that "proceeds" does not include direct costs and direct operational expenses, relying on Second and Seventh Circuit cases which found that "proceeds," as used in 18 U.S.C. § 1963(a) does not mean "gross receipts," and instead means the gains that a defendant received from illegal activity after certain costs are deducted.  See United States v. Masters, 924 F.2d 1163, 1369-70 (7th Cir. 1991) (allowing the deduction of any costs of performing the illegal activity); United States v. Lizza Industries, Inc., 775 F.2d 492 (2d Cir. 1985) (allowing the deduction of direct costs).

21.    Hallinan also relies on (1) the Supreme Court's decision in United States v. Santos, 128 S. Ct. 2020 (2008), which held that "proceeds" means net profits within the context of a money laundering forfeiture statute; (2) an Eastern District of Pennsylvania case finding that the cost of goods were not forfeitable under an analogous forfeiture statute, see United States v. Milicia, 769 F. Supp. 877, 88 (E.D. Pa. 1991); (3) various district court cases allowing deductions for costs

from forfeiture amounts in other statutory contexts; (4) the
rule of lenity; and (5) the Excessive Fines Clause of the Eighth
Amendment.

22.    In Lizza, 775 F.2d 492, the Second Circuit found
that the appropriate definition of "proceeds" in 18 U.S.C.
§ 1963(a)(3) is all revenue received on the illegal contracts at
issue, minus the "direct costs" incurred in performing those
contracts, but not excluding operating expenses, overhead
expenses, or taxes.  See id. at 498.  The Second Circuit also
held that the defendant, and not the Government, had the burden
of proving any direct costs subject to exclusion.  See id.

23.    In Lizza, the defendant had challenged the
district court's refusal to deduct operating and overhead
expenses and taxes.  However, the Second Circuit rejected that
view, explaining that:

> As noted in Russello, "[t]he legislative
> history clearly demonstrates that the RICO
> statute was intended to provide new weapons
> of unprecedented scope for an assault upon
> organized crime and its economic roots."  In
> fact, Congress instructed the courts that
> "[t]he provisions of this title shall be
> liberally construed to effectuate its
> remedial purposes."  § 904(a) of Pub. L. 91-
> 452, 84 Stat. 947.  We have already
> recognized that RICO's forfeiture provision
> was intended as "a more potent weapon than
> fines or prison terms...."  Thus, an
> expansive reading of § 1963(a)(1) is
> warranted.  In United States v. Huber, we
> cautioned that there may be circumstances
> under which a forfeiture sanction is so

harsh as to violate the Eighth Amendment's
prohibition against cruel and unusual
punishment. Punishment best fits the crime
when forfeiture—as it is in RICO—is keyed to
the magnitude of a defendant's criminal
enterprise. Calculation of forfeiture based
on gross rather than net profits from
illegal activity does not destroy this rough
proportionality.

Concededly, this method of calculation
leaves open a possibility that defendants
will be forfeiting profits that they would
have made outside of their criminal
activities. This should not cause us to
scuttle the method of computing forfeiture.
Forfeiture under RICO is a punitive, not a
restitutive, measure. Often proof of
overhead expenses and the like is subject to
bookkeeping conjecture and is therefore
speculative. RICO does not require the
prosecution to prove or the trial court to
resolve complex computations, so as to
ensure that a convicted racketeer is not
deprived of a single farthing more than his
criminal acts produced. RICO's object is to
prevent the practice of racketeering, not to
make the punishment so slight that the
economic risk of being caught is worth the
potential gain. Using net profits as the
measure for forfeiture could tip such
business decisions in favor of illegal
conduct.

Id. at 498-99 (internal citations omitted).

24.    The Court finds the Second Circuit's reasoning

persuasive, and finds that the Second Circuit's definition of

"proceeds" comports with the purpose of the RICO statute, the

purpose of criminal forfeiture, both in the context of RICO and

more broadly, the legislative history of RICO, and the Eighth

Amendment. Thus, the Court will adopt the Second Circuit view.

25.     Forfeiting all of the receipts of a RICO enterprise while allowing for the deduction of direct costs established by the defendant ensures that "the gain produced through [the RICO] activity" is forfeited, without requiring "the prosecutor to prove what the defendant's overhead expenses were."  S. Rep. No. 225, 98th Cong., 2d Sess. 199 (1984).

26.     Defining "proceeds" as all receipts from the illegal activity minus the direct costs of performing any contracts also strikes the appropriate balance between the Government's broad forfeiture powers under RICO and the constitutional protections of the Eighth Amendment.

27.     First, as the Government points out, the RICO forfeiture statute is mandatory, broad, and sweeping in its scope.  See Alexander v. United States, 509 U.S. 544, 562-63 (1993); see also Russello v. United States, 464 U.S. 16, 26 (1983) (explaining that RICO "was intended to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots").

28.     Further, criminal forfeiture is a form of punishment, as district from restitution, which seeks to return the victim and perpetrator to the status quo before the violation.  See United States v. Peters, 732 F.3d 93, 101-02 (2d Cir. 2013).  One of the aims of criminal forfeiture is deterrence, which is not achieved if the defendant is returned

to the economic position he occupied before his criminal offense.  See id.

29.    Under the "net profits" approach used by the Seventh Circuit, a defendant who spends the money he receives from his criminal enterprise would be punished differently from a defendant who saves it.  Even permitting deduction for operating expenses, as Hallinan advocates, would allow savvy businessmen to escape RICO forfeiture based upon how they structure their business.  Deduction of expenses would also result in greater forfeiture amounts for well-run RICO enterprises that derive a profit, and prevent the Government from forfeiting any proceeds in the case of poorly-run RICO enterprises that ultimately made ho profit.  These results do not fit with the aims of the RICO statute or criminal forfeiture.

30.    More importantly, following the Government's view – that it is entitled to collect the same funds over and over again, each time they were recycled through the RICO enterprise bank accounts – may violate the Excessive Fines Clause of the Eighth Amendment.  See U.S. Const. amend. XVIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.").  Where forfeiture operates as punishment for an offense, it constitutes a "fine" within the

meaning of the Excessive Fines Clause. See <u>United States v.</u>
<u>Bajakajian</u>, 524 U.S. 321, 333-35 (1998).

31.    Criminal forfeiture violates the Eighth Amendment
"if it is grossly disproportional to the gravity of a
defendant's offense." <u>Id.</u>  In order to make that determination,
courts evaluate (1) whether the defendant fits into the class of
persons for whom the criminal statute was principally defined;
(2) the maximum fine authorized under the Sentencing Guidelines;
and (3) the harm caused by the defendant.

32.    Here, as Hallinan points out, forfeiting an
amount equal to every deposit made into the RICO enterprise
accounts would result in counting the same proceeds many, many
times over.  For example, if a defendant loaned out the same
$100 ten thousand times, and received $5 in interest each time,
he would receive $105 deposited in his account when each loan
was paid.  At the end of the scheme, he would have spent $100
and he would have $50,100 in his account, corresponding to $100
in principal and $50,000 in interest.  Under the Government's
position, the defendant would need to forfeit $1,050,000 total,
corresponding to $1,000,000 in principal (the same $100 counted
ten thousand times) and $50,000 in interest.  That result is
plainly excessive.

33.    The Government argues that the Excessive Fines
Clause does not apply to forfeiture cases involving proceeds,

citing numerous cases in which courts have held that forfeiture of valuable property acquired with proceeds of criminal activity does not violate the Eighth Amendment.  See, e.g., United States v. Swanson, 394 F.3d 520, 529 n.4 (7th Cir. 2005); United States v. Betancourt, 422 F.3d 240, 251 (5th Cir. 2005) (finding that lottery winnings from lottery ticket purchased with drug proceeds was traceable to the offense and therefore forfeitable).  For example, the Government may forfeit a winning lottery ticket purchased with money received from drug sales, or investments purchased with illegal proceeds that substantially appreciated in value.

34.    The Government is correct that, to the extent Hallinan reinvested any of his proceeds by using those funds to extend principal to additional borrowers, the receipts from any additional loans (including the interest, fees, and principal) would then become forfeitable, regardless of how lucrative the additional loans became.  However, none of the cases the Government cites support counting the same proceeds multiple times.  In the Government's view, it may count money that was originally deposited into the RICO enterprise accounts and proceeds of unenforceable debt, and then if the money leaves the account to fund additional loans, the Government may count the same amount again when it is deposited as proceeds from the

additional loans.  The Government has not cited any authority
supporting that approach.

35.    To use the lottery ticket example, it is clear
that, if a drug dealer spent five dollars of his proceeds from
drug transactions to purchase a lottery ticket that ended up
winning $5 million, the Government would be able to forfeit the
$5 million.  See Betancourt, 422 F.3d at 251.  However, under
the approach the Government advocates here, if the drug dealer
used his lottery winnings to purchase a $5 million house, and
then sold the house to buy a $5 million yacht, and then sold the
yacht to buy a $5 million airplane, the Government would be
entitled to forfeit $20 million – the value of the lottery
winnings, the house, the yacht, and the airplane – even though
the defendant did not have them all at the same time.  That
result is not supported by any of the cases the Government
cites.

(2) The calculation of proceeds

36.    In addition to having varying interpretations of
the definition of the word "proceeds," the parties also disagree
about how "receipts" and "direct costs" should be calculated.

37.    The Government contends that the RICO enterprises
charged in Counts One and Two had total receipts of
$493,341,390.  Hallinan does not challenge the Government's

calculation of the total amount of deposits into the accounts identified by the Government. Instead, Hallinan argues that the RICO enterprises' total receipts include both receipts from loans extended in states that do not regulate payday lending at all, i.e., loans that were legal, and loans extended in states with interest rate limitations, i.e., loans that involved unlawful debt collection in violation of 18 U.S.C. 1962. Hallinan contends that the Government's method for subtracting receipts from legal loans is not precise enough to satisfy the Government's burden to establish the amount of proceeds beyond a reasonable doubt. Therefore, according to Hallinan, the total receipts of the RICO enterprises cannot be used to estimate the total receipts from unlawful debt collection.

38. In particular, the Government has introduced evidence that 4.79 percent of the total loans were extended in states where payday lending is legal, based upon an analysis of the "leads" generated in order to initial payday loans. The Government obtained four spreadsheets of leads produced by HPDLE companies, which indicated that 14,556 of 303,816 leads were for individuals living in states where payday lending was not prohibited or regulated, or 4.79 percent.

39. Although, as Hallinan points out, not all leads the HPDLE purchased ultimately resulted in the extension of loans to borrowers, the Court finds that the Government's

extrapolation method is sufficient for the Government to establish the total receipts of the business. Given RICO's broad purpose, a defendant cannot shield himself from liability simply by mixing legal and illegal businesses to such a degree that the legal business cannot be separated out.

40.    Here, although Hallinan challenges the Government's method of extrapolation, Hallinan does not provide any affirmative evidence of his own regarding which loans were extended in states where payday lending was legal. As a result, Hallinan has not met his burden to overcome the evidence of total receipts introduced by the Government. However, due to the Government's concession that 4.79 percent of the loans extended were in states where payday lending was legal, the Court will reduce the amount of proceeds by that amount, after direct costs are deducted.

41.    Therefore, the Court finds that the Government has established beyond a reasonable doubt that the amount of total receipts from unlawful debt collection as charged in Counts One and Two is $493,341,390.

42.    Turning to the deduction of direct costs, the parties disagree about which costs may be deducted. Hallinan argues that he has met his burden to establish that the deductible direct costs include the funds extended out to borrowers as principal, as well as eight categories of "direct

operational expenses."  Those eight categories are lead
acquisition expenses, advertising and promotional expenses,
Black Oak expenses, credit card collection fees, credit
verification expenses, Intercept fees, ACH returns and
recoveries, and bank service charges, all of which total
$59,099,749.

43.    The Government contends that costs are not
deductible under the appropriate definition of "proceeds," and
that even if direct costs are deductible, Hallinan has not met
his burden to deduct any costs.  Specifically, the Government
contends that Hallinan has not met his burden to deduct the
funds loaned out to borrowers, because the money the HPDLE
received from borrowers consisted primarily of interest and
fees, not principal.  The Government further argues that none of
the eight categories of costs that Hallinan seeks to deduct are
"direct costs."

44.    The Second Circuit's view of direct costs, which
this Court adopts, does not define direct costs in terms of
money that is returned to the unlawful enterprise, but in terms
of the costs the unlawful enterprise incurs as a result of
performing the contracts.  See Lizza, 775 F.2d at 498-99.  Here,
the RICO enterprises spent the principal to extend loans to
borrowers, regardless of whether or not that principal was

returned.  As a result, the principal extended to borrowers may be deducted.

45.    However, the "direct operational expenses" Hallinan lists cannot be deducted.  As explained above, allowing a defendant to deduct regular business expenses would punish efficient enterprises and reward inefficient ones.  That does not comport with the goals of criminal forfeiture or the RICO statute.

46.    Here, Hallinan has established that the amount of the funds loaned out to borrowers was $424,741,852.  The Government does not challenge that number.  Therefore, the Court will subtract that amount from the total receipts Hallinan received through the unlawful debt collection of the RICO enterprises charged in Counts One and Two.

47.    As a result, the total amount of the proceeds Hallinan received is $68,626,538.

48.    As explained above, this number will be reduced by 4.79 percent, in order to account for loans extended in states where payday lending is legal.  Therefore, the total amount of the proceeds Hallinan received as result of his conviction for RICO conspiracy as charged in Counts One and Two is $65,339,327.

49.    A defendant must forfeit the amount of illicit proceeds as determined by the Court, even if the defendant no

longer possesses the funds.  See United States v. Edwards, 303 F.3d 606, 643-44 (5th Cir. 2002); United States v. Corrado, 227 F.3d 543, 558 (6th Cir. 2000); United States v. Robilotto, 828 F.2d 940, 949 (2d Cir. 1987).

50.    Title 18 of the United States Code, Section 1963(m) provides that, if any of the property subject to forfeiture under 18 U.S.C. § 1963(a), as a result of any act or omission of the defendant (1) "cannot be located upon the exercise of due diligence" or (2) "has been commingled with other property which cannot be divided without difficulty," the court shall order forfeiture of any other property of the defendant up to the value of any property subject to forfeiture. 18 U.S.C. § 1963(m).

51.    The forfeiture of substitute assets is appropriate and necessary where a defendant has made it difficult to identify the location of hidden proceeds by commingling the criminal proceeds with untainted funds.  See Voigt, 89 F.3d at 1087-88.  The Government need only demonstrate due diligence in discovering the defendant's actions to commingle or otherwise make it difficult to trace the proceeds of his crime.  See United States v. Seher, 562 F.3d 1344, 1373 (11th Cir. 2009).

52.    Based upon the Government's extensive financial investigation over several years, which demonstrated the

excessive commingling of Hallinan's funds, the Government has proven due diligence in tracing the proceeds of the Hallinan Payday Lending Companies' RICO enterprise, and identifying directly forfeitable property pursuant to 18 U.S.C. § 1963(m), and accordingly, an order for substitute assets is appropriate.

53.     The Government may seek an order for substitute assets in a preliminary order of forfeiture along with an order for money judgment and directly forfeitable property.  See Fed. R. Crim. P. 32.2(b)(2).

54.     Hallinan's interest in the property located at 641 N. Spring Mill Road, Villanova, Pennsylvania, is forfeitable pursuant to 18 U.S.C. § 1963(m) as a substitute asset to be credited against Hallinan's forfeiture money judgment.

## Forfeiture Pursuant to 18 U.S.C. 982(a)(1)

55.     Title 18 of the United States Code, Section 982, provides in relevant part that in imposing a sentence on a person convicted of an offense in violation of 18 U.S.C. § 1956, the court "shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property."  18 U.S.C. § 982(a)(1).

56.     Here, Hallinan was convicted of nine counts of money laundering in violation of 18 U.S.C. § 1956(a)(2), as

charged in Counts Nine through Seventeen of the Superseding Indictment.

57.     The evidence at trial established that Hallinan paid Ginger a total of $90,000 in order to assist in the fraud in the Indiana Litigation.  See Gov't Exs. 100A; 317-335.  These payments, which came from proceeds of the Hallinan Payday Lending Enterprise, constituted money laundering, and therefore were involved in the offense under 18 U.S.C. § 982(a)(1).  See United States v. Puche, 350 F.3d 1137, 1154 (11th Cir. 2003) (affirming money judgment equal to sums paid to money launderer).

58.     Therefore, $90,000 is forfeitable as property involved in the offenses charged in Counts Nine through Seventeen of the Superseding Indictment pursuant to 18 U.S.C. § 982(a)(1), and the Government is entitled to a money judgment in that amount.  Because the evidence at trial established that the money Hallinan paid to Ginger constituted proceeds of the HPDLE, however, this $90,000 money judgment is concurrent to the $65,339,327 money judgment for the RICO offenses.

### Forfeiture Pursuant to 18 U.S.C. § 1963(a)(2)(A)

59.     Title 18 of the United States Code, Section 1963(a)(2)(A), provides that "[w]hoever violates any provision of [18 U.S.C. §] 1962 . . . shall forfeit to the United States,

irrespective of any provision of State law . . . any interest in
. . . any enterprise which the person has established, operated,
controlled, conducted, or participated in the contact of, in
violation of [18 U.S.C. §] 1962." 18 U.S.C. § 1963(a)(2)(A).

60.    The evidence at trial establishes that the
specific property listed as Properties 1 through 13 are each
property of individual companies Hallinan Capital Corp., Blue
Water Funding Group LLC, Mill Realty Management LLC, Apex 1
Processing, Fifth Avenue Financial Inc., Palmetto Financial,
Inc., and Sabal Financial Inc.

61.    Hallinan concedes that all of these companies are
part of the HPDLE with the exception of Hallinan Capital Corp.
("HCC").  Hallinan argues that the evidence at trial
demonstrated that HCC was not a payday lending company, and
instead that it operated in real estate.  According to Hallinan,
the sole evidence of a connection between HCC and payday lending
is ledgers showing that approximately eighteen payments were
made from HCC to GR Financial, a company controlled by Ginber,
in the amount of $205,800.

62.    The Government argues that HCC was in fact a
payday lending company.  The Government asserts that the
evidence at trial established that HCC was Hallinan's umbrella
company, which he used to fund all of his business ventures,

including all of his payday lending operations.  See Exs. 263-69 (HCC general ledgers for 2008 through 2014).

63.    The Court finds that the Government's evidence is sufficient to establish that HCC was the umbrella company for all of Hallinan's payday lending activity, and therefore was part of the HDPLE.

64.    The Court finds that Hallinan Capital Corp., Blue Water Funding Group LLC, Mill Realty Management LLC, Apex 1 Processing, Fifth Avenue Financial Inc., Palmetto Financial, Inc., and Sabal Financial Inc. are each part of the HDPLE enterprise.  As such, property held by these companies is property of the HPDLE.  As property of the HDPLE, Hallinan's interest in Properties 1 through 13 are forfeitable pursuant to 18 U.S.C. § 1963(a)(2)(A).

65.    The evidence at trial and at the forfeiture hearing establishes that the specific property listed as Properties 14 through 18 are funds received in bank accounts from Hallinan Capital Corp., which is part of the HPDLE.  As property traceable to the HDPLE, Properties 14 through 18 are forfeitable pursuant to 18 U.S.C. § 1963(a)(2)(A).

66.    The evidence at trial and the forfeiture hearing establishes that the specific property listed as Properties 19 through 21 are vehicles purchased with HCC funds.  As HCC is part of the HDPLE, Properties 19 and 21 are traceable to the

HPDLE, and therefore forfeitable pursuant to 18 U.S.C.
§ 1963(a)(2)(A).

Forfeiture Pursuant to 18 U.S.C. § 1963(a)(2)(D)

67.    Title 18 of the United States Code, Section
1963(a)(2)(D), provides that "[w]hoever violates any provision
of [18 U.S.C. §] 1962 . . . shall forfeit to the United States,
irrespective of any provision of State law . . . any property .
. . affording a source of influence over [] any enterprise which
the person has established operated, controlled, conducted, or
participated in the contact of, in violation of [18 U.S.C.
§] 1962."  18 U.S.C. § 1963(a)(2)(D).

68.    In order to forfeit property pursuant to 18
U.S.C. § 1963(a)(2)(D), the Government must establish that the
property had a "substantial connection" to Hallinan's violation
of 18 U.S.C. § 1962.  Pellulo, 14 F.3d at 901 (explaining that
"[s]ection 1963(a) essentially provides that any person who
violates § 1962 shall forfeit to the United States any of his
property if the property had a substantial connection to his
violation of § 1962").

69.    Property has a substantial connection to a RICO
violation when the property is "used to further the affairs of
the enterprise," United States v. Anguilo, 897 F.2d 1169, 1214
(1st Cir. 1990), or where "use of the property made 'the

37

prohibited conduct less difficult or more or less free from obstruction or hindrance,'" United States v. Herder, 594 F.3d 352, 364 (4th Cir. 2010) (quoting United States v. Schifferli, 895 F.2d 987, 990 (4th Cir. 1990)).

70.    Hallinan's use of the Boca Raton Property as the address for various corporate documents and tax filings for the Hallinan Payday Lending Companies did not create a substantial connection between the Boca Raton Property and Hallinan violation of 18 U.S.C. § 1962.  Hallinan could have used any address for those filings, and his use of the Boca Raton Property address, in particular, neither "further[ed] the affairs of the enterprise," Anguilo, 897 F.2d at 1214, nor "made 'the prohibited conduct less difficult or more or less free from obstruction or hindrance,'" Herder, 594 F.3d at 364 (quoting Schifferli, 895 F.2d at 990).  See, e.g., United States v. Nicolo, 597 F. Supp. 2d 342, 357 (W.D.N.Y. Feb. 17, 2009) (finding that defendant's use of his properties as a mailing address for his business "merely 'incidental or fortuitous'" in relation to the defendant's money laundering offenses, and therefore insufficient to warrant forfeiture (quoting United States v. Parcel of Property, 337 F.3d 225, 233 (2d Cir. 2003)); United States v. King, 231 F. Supp. 3d 872, 1010-11 (W.D. Okla. 2017) (finding that defendant's sporadic use of his house to

"take care of some [illegal bookkeeping]-related business" was too tangential to support forfeiture of the house).

71.     However, Hallinan's use of the Boca Raton Property to conduct all of the business for the Hallinan Payday Lending Companies for several months per year did create a substantial connection between the Boca Raton Property and Hallinan's violation of 18 U.S.C. § 1962.  By using his private home to shelter the activities of the conspiracy, Hallinan "further[ed] the affairs of the enterprise[s]" charged in Counts One and Two, Anguilo, 897 F.2d at 1214, and "made 'the prohibited conduct less difficult or more or less free from obstruction or hindrance,'" Herder, 594 F.3d at 364 (quoting Schifferli, 895 F.2d at 990).

72.     As the place of business for the head of the payday lending activities for several months per year, the Boca Raton Property facilitated the RICO enterprises charged in Counts One and Two, furthered their affairs, and was instrumental to their success.

73.     As property which was used to facilitate the RICO enterprises' activities, the Boca Raton Property afforded a source of influence over the RICO enterprises charged in Counts One and Two.  Therefore, the Boca Raton Property is subject to forfeiture pursuant to 18 U.S.C. § 1963(a)(2)(D).

74.    Under the "rule of proportionality," property affording a source of influence over a RICO enterprise pursuant to 18 U.S.C. § 1963(a)(2)(D) is only subject to forfeiture "to the extent [it is] tainted by the racketeering activity." Anguilo, 897 F.2d at 1212.  However, here, Hallinan has not produced any evidence establishing that he only used a portion of his home to conduct business activity.  Therefore, the entire Boca Raton Property is "tainted" by the racketeering activity and therefore subject to forfeiture pursuant to 18 U.S.C. § 1963(a)(2)(D).

## IV.    **CONCLUSION**

For the reasons stated above, the Government is entitled to the forfeiture of (1) $65,339,327 as proceeds of the RICO conspiracy charged in Counts One and Two, pursuant to 18 U.S.C. § 1963(a)(3); (2) $90,000 as property involved in the commission of the money laundering offenses charged in Counts Nine through Seventeen, pursuant to 18 U.S.C. § 982(a)(1); (3) Properties 1 through 21 as property that is an interest in the RICO enterprise, which Hallinan established, controlled, conducted, or participated in the conduct of, in violation of 18 U.S.C. § 1962, as charged in Counts One and Two of the Superseding Indictment, pursuant to 18 U.S.C. § 1963(a)(2)(A); and (4) Hallinan's right, title and interest in the Boca Raton

Property as property that afforded a source of influence over the RICO enterprise pursuant to 18 U.S.C. § 1963(a)(2)(D).

      An appropriate order follows.