# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CHARLES M. HALLINAN | Honorable Eduardo C. Robreno<br><br><br>2:16-cr-00130-ER |

# EMERGENCY MOTION FOR BAIL PENDING APPEAL

Charles M. Hallinan, through his undersigned attorneys, respectfully submits this emergency motion for bail pending appeal.  This motion is urgent because the Defendant, a 77 year old man, is due to report to the Bureau of Prisons on July 17th, 2018, which will interrupt life-saving treatment he is currently undergoing for bladder cancer and will delay the prostate cancer treatment he is expected to begin before his report date.  Counsel is mindful of the fact that many of these arguments were already raised before the District Court in requesting a report-date for the Defendant, but raises them again because the procedural posture has changed.  Due to the urgent nature of the request, counsel also intends to concurrently file a motion for bail pending appeal in the Third Circuit so that in the event the Court denies this request, it will already be fully briefed in the Circuit and can be decided before his report date.

Bail pending appeal is appropriate for three reasons:  (1) Mr. Hallinan has two forms of life-threatening cancer complicated by his age and an underlying coronary heart disease and a transfer to the Bureau of Prisons will delay and disrupt his treatment and endanger his life; (2) there are substantial issues on appeal for which a reversal, new trial, or resentencing is likely; and (3) Mr. Hallinan is not a risk of flight or danger to the community.

I.    **SUBMITTING HIMSELF TO THE CUSTODY OF THE BUREAU OF PRISONS WILL ENDANGER MR. HALLINAN'S LIFE**

    **A.    Mr. Hallinan Has Two Aggressive and Life Threatening Cancers Complicated By An Underlying Heart Condition For Which One Misstep Could Be Fatal**

The evidence is uncontroverted that Mr. Hallinan is suffering from two forms of very aggressive cancer in his bladder and prostate, which is complicated even more due to his underlying heart condition. *See* [Dkt. 493, Exhibit B (report of Dr. David Ellis) (hereinafter "Ellis Report")]. Mr. Hallinan is not only being treated by Dr. Ellis, but a team of specialists including Dr. Peter Gordon Spitzer, the Chief of Urology at the Hospital of University of Pennsylvania. Dr. Spitzer concurs that Mr. Hallinan has "both a high-grade T1 bladder cancer [and] high-risk prostate cancer." *See* Sentencing Memorandum, Exhibit J.

In order to treat the bladder cancer, Mr. Hallinan is **currently undergoing** a six-week chemotherapy treatment that cannot be interrupted. As noted by Dr. Ellis:

> The bladder cancer is most worrisome and will initially require a first course of chemotherapy administered by direct foley catheterization of the urethra (penis) and bladder with direct instillation of chemotherapeutic agent performed once per week under sterile conditions. Close observation and then immediate treatment for 24-48 hours follows for side effects of infection, nausea, bleeding, retention, respiratory symptoms, and early detection of tuberculosis among others.

*Id.* Following the expected six-week course of treatment, Mr. Hallinan will have a cystoscopy and biopsy in an operating room with full anesthesia to assess how he

2

is responding to treatment so that a decision can be made as to whether he undergoes the same treatment again or whether it should be modified. *Id.* Dr. Ellis states that he also requires "regular and frequent radiologic testing (CT scan, MRI, blood analysis, urine pathology analysis) in addition to both bladder and prostate testing)." *Id.* Dr. Ellis stresses that "the key is to have regular and frequent treatments and follow ups to catch [the bladder cancer] before spreading." *Id.* If Mr. Hallinan were to report to the Bureau of Prisons, this six-week course of treatment will be interrupted, directly contravening Dr. Ellis's medical advice.

Following or simultaneous to the treatments for bladder cancer, treatments for the prostate cancer will require monthly hormone injections and then most likely radiation therapy depending on the progress of the bladder cancer. *Id.* Radiation will be administered **for 44 daily treatments.** *Id.* This too is further complicated by Mr. Hallinan's cardiac issues, for which "[h]is cardiologist will need regular and frequent involvement with the patient and the other treatment physicians of the treatment team to achieve correct results."

Dr. Justin Bekelman, a Professor and Doctor at the Perelman School of Medicine – Hospital of the University of Pennsylvania, at the Abramson Cancer Center, concurred and laid out the following treatment plan: "1. We will obtain the prostate path for review.  2.  We will obtain an MRI.  3. We will coordinate with Dr. Guzzo and Dr. Ellis (local urologist) regarding BCG [a type of chemotherapy

3

treatment]; 4. We will start androgen suppression with Dr. Ellis; androgen suppression could continue for 3 to 9 months while BCG and other local treatments for his bladder cancer are given . . . and then, after some recovery period and response assessment, we can consider radiation therapy or alternative[] strategies based on the clinical situation at that time."  Sentencing Memorandum, Exhibit K.

Mr. Hallinan will require a team of doctors to treat his numerous and life-threatening medical issues, which includes a "urologist, radiation oncologist, medical oncologist, [and] internist."  Ellis Report, at 2.  Dr. Ellis cautions as to what could happen if there is any disruption or delay in Mr. Hallinan's testing or treatment:

> I remain concerned that even a small delay in testing, treatment, biopsy or observation will allow the bladder cancer to escape local control.  Subsequent spreading of disease create a metastatic situation **that will not likely be curable**. . . . I emphasize that Mr. Hallinan suffers an unusual, complicated and challenging circumstance.  He has two localized aggressive high risk cancers that will require intensive involvement to keep from spreading.  A mis-step will greatly increase the chance that spread will occur.  A mis-step can allow spread to go undetected so that secondary interventions will become useless.  Spread can happen quickly and require a high degree of diligence.

*Id.*

**B.      Forcing Mr. Hallinan To Interrupt His Chemotherapy And Submit Himself To The Custody Of The Bureau Of Prisons Would Endanger Mr. Hallinan's Health**

As noted by Dr. Ellis, "even a small delay" in Mr. Hallinan's treatment or testing will allow the bladder cancer to spread.  If that happens, according to Dr. Ellis's uncontested opinion, it may no longer be curable.  There will be much more than a "small delay" if Mr. Hallinan is transferred to the Bureau of Prisons.  The record is completely barren of any evidence as to how Mr. Hallinan's medical needs would be met and it is uncontested that his treatment would be severely disrupted.  Having been given weeks to submit an "expert" report and secure a witness to testify about the Bureau of Prison's evaluation of Mr. Hallinan's case and the treatment plan it would provide for a 77 year old man with two forms of aggressive cancer, the government submitted a three-page form letter.  It submitted no evidence as to whether the Bureau of Prisons has medical professionals who have any experience treating such complicated and unusual set of conditions; it submitted no evidence showing that any medical provider at the Bureau of Prisons had even reviewed his records; it submitted no evidence as to how a transfer to the Bureau of Prisons would not cause immediate and dangerous repercussions to Mr. Hallinan's health (which it would); it submitted no evidence that anyone in the government had spoken to Mr. Hallinan's treating providers (which they have not); it submitted no evidence that the Bureau of Prisons had formulated any kind of

5

treatment plan or even how Mr. Hallinan would be evaluated by so many specialists; it submitted no evidence as to whether it has the diagnostic equipment necessary to treat such a complicated set of conditions; it submitted no evidence that it is currently treating anyone of such age with such complicated diagnosis – or even that it has ever in the history of the Bureau of Prisons successfully treated a similar case without significant missteps that imperils the individual's life.

The evidence is also unrefuted that the Bureau of Prisons faces extreme staff shortages, lack of access to qualified medical providers, lack of financial resources, and administrative problems in even getting patients to their doctor appointments such as lock-downs or the failure to have adequate personnel to drive inmates to their appointments.  Defendant's two experts produced unopposed testimony that the Bureau of Prisons has a long track record of giving substandard care to inmates.  Phillip S. Wise, former Assistant Director of the Federal Bureau of Prisons with responsibility for Health Care for the agency, certified under oath in his report that it is likely a mis-step will occur over Mr. Hallinan's possible treatment by the Bureau of Prisons due to "its difficulty maintaining clinical staff, its staff shortages in other departments, [] its administrative requirements for specialty care, . . [and] delay of care due to institution emergencies or administrative or security requirements."  [Dkt. 493, Exhibit A, hereinafter "Wise Report"].  Maureen Patricia Baird, who worked for the Bureau of Prisons for 28

years and was a warden at multiple prisons, flatly said that the Bureau of Prisons

would not be able to care for Mr. Hallinan when asked if any Federal Medical

Center could properly treat Mr. Hallinan given his age and medical conditions:

> In all due respect to the Bureau of Prisons, I would have to say that,
> because he does fall into the one percent of chronically ill, of the most
> chronically ill individuals that would be in the Bureau of Prisons,
> there would be some missteps along the line.  And therefore, to
> manage him with appropriate care, I would have to say no.  Would
> they try their best?  They would try.  But there would be
> circumstances beyond the Bureau of Prisons' control that, no fault of
> their own, there would – would happen, and there would be missteps. .
> . .

Sentencing Tr. at 71.

If forced to report to the Bureau of Prisons, Mr. Hallinan will be the sickest

1% of all inmates.  Wise Report at 4.  This will be complicated further by his age

as "the BOP is ill equipped to effectively manage the needs of elderly inmates."

*Id.* at 5.  Moreover "the scope of care and his access to medical specialists will be

more limited," and "consistent chronic care may be disrupted or not provided on a

timely basis."  *Id.*  The only documentary evidence forwarded by the government

to support its argument that the Bureau of Prisons can effectively care for a

seventy-seven year old with two aggressive forms of cancer and underlying heart

disease was a three-page form letter used in every federal case that says in sum that

the Bureau of Prisons can handle anything without any individualized assessment

of Mr. Hallinan's case.  Sentencing Hearing, Gov't Exhibit 1.  The government's

witness who testified in support of this letter had not spoken to Mr. Hallinan's

doctors; had only skimmed his medical reports – apparently finding it too difficult

to spend the time to read them all; had not spoken to any medical providers at

Butner or any other medical facility about Mr. Hallinan's complicated medical

condition; never worked in Butner of another medical facility (but had toured it

once); and could not say if the Bureau of Prisons had ever treated anyone as sick as

a 77 year old man with two forms of aggressive cancer and an underlying heart

condition.  The kind of care Mr. Hallinan will likely receive from the Bureau of

Prisons is embodied in the government's witness:  someone who only skims

medical records and signs form letters because of busy schedules and staffing

issues.  This does not comport with the goals of sentencing, due process, or the

right for Mr. Hallinan to be free from cruel and unusual punishment.  As noted by

the Supreme Court in *Estelle v. Gamble*:

> These elementary principles establish the government's obligation to
> provide medical care for those whom it is punishing by incarceration.
> An inmate must rely on prison authorities to treat his medical needs; if
> the authorities fail to do so, those needs will not be met. . . . [D]enial
> of medical care may result in pain and suffering which no one
> suggests would serve any penalogical purpose.  The infliction of such
> unnecessary suffering is inconsistent with contemporary standard of
> decency as manifested in modern legislation codifying the common
> law view that "it is but just that the public be required to care for the
> prisoner, who cannot, by reason of the deprivation of his liberty, care
> for himself.

429 U.S. 97 (1976) (citations omitted).

In sum, not only will there be an absolute disruption in Mr. Hallinan's current chemotherapy treatment, the government has made no showing that the Bureau of Prisons could ever adequately care for him.  The Defendant, however, put forth two experts – one who testified under oath and the other who submitted a report under oath – that the Bureau of Prisons simply cannot care for Mr. Hallinan. It is clear what will likely happen with the delays and missteps:  Mr. Hallinan's bladder cancer may spread and prostate cancer may worsen leaving any doctor without other treatment options.  Although not mentioned by the government's expert at the sentencing hearing, the Bureau of Prisons does have a hospice facility in Springfield, Missouri.

## II.   BAIL PENDING APPEAL IS APPROPRIATE

18 U.S.C. § 3143(b) requires a judicial officer to detain a defendant sentenced to a term of imprisonment unless:  (1) the person is not likely to flee or pose a danger; and (2) that the appeal is not for the purpose of delay and raises a "substantial question of law or fact" that is likely to result in a reversal, new trial, or a reduced term of imprisonment.  Here, not only would bail pending appeal likely prolong Mr. Hallinan's life, but the requirements of § 3143(b) are easily met.

### A.   The Appeal Raises Substantial Questions Of Law

The issues Mr. Hallinan intends to raise on appeal are substantial – i.e. "fairly debatable."  *United States v. Miller*, 753 F.2d 19 (3d Cir. 1985); *United*

*States v. Smith*, 793 F.2d 85 (3d Cir. 1986).  These issues will include: (1) the government's use of the July 2013 privileged email at trial when the Third Circuit had already found that it was protected work product and failed to meet the crime-fraud exception; (2) the Court's failure to fashion a sentence that takes into account Mr. Hallinan's serious, life-threatening medical conditions; and (3) the failure to instruct the jury on willfulness for the RICO counts in light of the Defendant's good faith defense.  Mr. Hallinan may raise additional arguments on appeal, but any one of these three issues alone is a substantial ground to warrant bail.

### 1.    The Government's Use of the July 2013 Privileged Email In The Grand Jury And At Trial Is Reversible Error

As this Court is aware, during the grand jury investigation Mr. Hallinan's accountant produced a July 2013 email, which contained legal advice from attorney and codefendant Wheeler Neff that was then forwarded to Mr. Ermel by Mr. Hallinan.  The government successfully moved before the grand jury Judge to allow it to present the email to the grand jury under the crime fraud exception to the attorney client privilege.  Mr. Hallinan immediately appealed.  The Third Circuit reversed the decision of the grand jury Judge, holding "that the crime-fraud exception to the attorney work-product doctrine does not apply to the email at issue." *In re Grand Jury #3*, 847 F.3d 157 (3d Cir. 2017).  The Circuit went on to suggest that the mere act of using the email in the grand jury would call for a new trial unless the government showed the error was harmless.  *Id.* at 15 ("None of

this should suggest that, in the event Doe is convicted (based on the superseding indictment) and appeals, he should automatically get a new trial because the Government used the protected work product. *That is because* the Government could avoid a retrial by showing the error was harmless.").  In other words, the only reason why the government's use of the privileged email would not cause a reversal is if the government could show harmless error.  The government new the risk it was taking in using that email and took it on proudly:

> But getting back to the hypothetical possibility that [the indictment] could be tainted, that's entirely our risk.  That would cause us potential harm, I suppose, presumably Mr. Hallinan would seek to dismiss the indictment and that's really a risk that it's up to us to decide whether we want to take that risk.  We've looked at the law, we feel comfortable with our facts.  We believe it's worth taking the risk to present this e-mail.

Emergency Motion to Stay, Transcript of Oral Argument (July 16, 2015).

The government did much more, however, than simply present the email before the *grand jury* – it used the email *at trial* to secure Mr. Hallinan's conviction.  Shortly before the trial began, the government moved *in limine* for an order to use the email at trial.  Although it acknowledged that the Third Circuit found that the email did not meet the crime fraud exception, it argued that there were now amorphous "tax crimes" that the attorney-client advice furthered.  It was not clear as to what those crimes actually were or how the July 2013 email related

11

to those crimes.  The Court nonetheless granted the government's motion, allowing the email to be used at trial despite the Third Circuit's earlier ruling.

The email, government Exhibit 400, was integral to the government's case. It was used numerous times throughout the trial and extensively in the opening and closing.  *See, e.g.* Tr. at 42 (9.28.17) (opening) ("You're going to hear that Mr. Neff even sends Hallinan an e-mail, where Mr. Neff instructs Hallinan to go back and change the old tax returns . . . ."); *id.* at 44 (opening) ("There is an e-mail where Mr. Neff warned Mr. Hallinan that the case could be worth $8 to $10 million and Mr. Hallinan might have to pay that."); *id.* at 45 (opening) ("A lot of the evidence you'll see in the case will be the defendants' own words.  Mr. Hallinan's emails, Mr. Neff's e-mails . . . ."); Tr. at 66-92 (10.5.17) (testimony of Rod Ermel discussing the e-mail at length); Tr. at 140-41 (11.20.2017) (closing) (displaying the email to the jury and characterizing it as anything but "garden variety legal advice"); *id.* at 165 ("Wheeler Neff indicated to Charles Hallinan, in that July 12, 2013 e-mail, that Charles Hallinan faced exposure of $8 to $10 million."); *id.* at 167 ("There's the July 16 e-mail that Charles Hallinan sent to Rod Ermel, which forms the basis of Count 7 . . . ."); *id.* at 106 ("This is the email, July 12th, 2013 email that Wheeler Neff sent to Charles Hallinan warning him of a $10 million judgment potentially and saying essentially, cook the books . . . .").  It was also an overt act included by the government in the Indictment itself.

12

The government has only recently enumerated the "tax crimes" to which it was referring in its motion *in limine*. It is clear why the government took so long to give a straight answer. None of the "crimes" that the government cites, to the extent they even are crimes, were furthered by the forwarding of the July 2013 email to Mr. Ermel. In its opposition to Wheeler Neff's motion to bail pending appeal that was filed in the Third Circuit, the government cited three crimes that it believes were furthered by the July 2013 email: (1) a scheme to willfully fail to file taxes of Apex 1 Processing; (2) the representation to the IRS in 2015 that Mr. Hallinan did not own Apex 1 Processing; and (3) the failure to amend Mr. Hallinan's tax returns for 2009 to 2012 if he did own Apex 1 Processing, which the government submitted he did not. *Id.* at 7-8, 14. To the extent these explanations make sense – and the last does not at all - these are simply *post hoc* rationalizations with a temporal disconnect to the July 2013 legal advice contained in the email.

First, the email did not further a scheme to willfully fail to file taxes for Apex 1 Processing. There is nothing in the July 2013 email as to whether tax returns should or should not be filed for Apex 1 Processing. Indeed, there is nothing at all in evidence that Mr. Neff ever told Mr. Ermel to not file taxes for Apex 1 Processing. The email was about amending tax returns – not filing or failing to file new returns. It also is noteworthy that Apex 1 Processing stopped

13

doing business in which case most of the tax returns about which the government claims would have solely been informational returns.

Second, the email did not further the crime of making false representations to the IRS during a 2015 audit (presumably the government is referring to a violation of 18 U.S.C. § 1001). It is perplexing to say the least how Mr. Neff's legal advice in July 2013 for Mr. Hallinan to consider amending his tax returns, could have furthered a misrepresentation to the IRS in 2015. The email was not shown to the IRS certainly during that audit nor referenced in any way. When Mr. Neff's legal advice was forwarded to Rod Ermel in 2013, no one – not even the IRS – knew that it would be conducting an audit in 2015. And there is no evidence that the email was used in any way as part of that audit.

Finally, the government's third argument is completely ridiculous. It posits that if Mr. Hallinan did sell Apex 1 Processing to Randall Ginger (which the government submits did not happen), then Mr. Hallinan committed a crime in not amending his own tax returns to remove Apex 1 Processing. Thus, in the Indictment the government takes the position that Mr. Hallinan always owned Apex 1 Processing and it should have appeared on his taxes after 2013; but for purposes of this argument the government argues that Mr. Hallinan did sell Apex 1 Processing to Randall Ginger and should have amended his tax returns to reflect that sale. Thus, the government's premise is diametrically opposite with its own

14

charging decisions.  Maybe even simpler, the government's arguments make no sense as it is not a crime to not amend your taxes.  *See, e.g., Broadhead v. Commissioner*, 14 T.C.M. 1284 (1955) (rejecting the government's position that the taxpayer evaded taxes for not filing an amended return); *Badaracco v. Commissioner*, 464 U.S. 386 (1984) ("[T]he Internal Revenue Code does not explicitly provide either for a taxpayer's filing or for the Commissioner's acceptance of an amended return . . . ."); *Taylor v. C.I.R.*, 1997 WL 739055 (Nov. 17, 1997) ("The failure to file amended returns does not evince an intent to evade taxes.").  Indeed, if Congress made it a crime, it would raise serious Fifth Amendment concerns.  *See Marchetti v. United States*, 390 U.S. 39 (1968) (finding it unconstitutional to prosecute a gambler for failing to report his gambling earnings when faced with criminal prosecution for failing to pay gambling taxes).

The government's attempts to bundle all of these issues into these ambiguous "tax crimes" fails because its central premise about the email is incorrect.  The government falsely claims that "Ermel [] testified that every action he took from July 16, 2013, with regard to the preparation and filing of Hallinan and Apex 1's tax returns, was traceable to the email he had received on July 16, 2013, from Hallinan."  Gov't Resp. at 14.  The opposite is true – Mr. Ermel testified consistently that the email did not prompt any action other than him putting it in a file with a flag on it:

> Q.  As a result of Mr. Hallinan forwarding that email beginning on July the 12th, 2013, you didn't do anything as a result of that, am I correct?
>
> A.  Other than just put it in my file and have a little red flag that something needs to be done at some point in time.

Tr. at 197 (10.5.17); *see also* Tr. at 91-92 (10.5.17) (R. Ermel) (testifying that he never spoke to Mr. Hallinan after receiving the July 2013 email).  Ermel also testified that he did not even fully review Neff's legal advice in the July 2013 email and that he "skimmed over" it because "those type of things, that's foreign to me."  Tr. at 81 (10.5.17).  It is hard for the legal advice to further some fraud when Mr. Ermel does not even comprehend it.

Counsel understands that the Court already made its rulings on the admissibility of the July 2013 email, but given the Third Circuit's opinion and order, its note that even the use of the email in *the grand jury* could lead to reversal unless the government showed harmless error, the contravention of the Third Circuit's holding by actually using the email *at trial*, and the government's suspect "tax crimes" rationale that the government came up *post hoc*, it can at least be said that this is a substantial issue that is fairly debatable.

### 2.   It Was Error For The Court To Discount The Defense's Bureau of Prisons Experts At The Sentencing Hearing

As described in more detail above, the government did not carry its burden of proving that the Bureau of Prisons can care for Mr. Hallinan given its conclusory evidence only stating that the BOP can generally treat oncology

patients.  Mr. Hallinan submitted letters from multiple doctors evidencing his

incredibly serious medical conditions.  Once Defendant presents proof of a serious

medical issue – the burden shifts to the government to "assure the court that the

Bureau of Prisons ("BOP") can adequately care for" the defendant given his or her

specific needs.  *United States v. Martin*, 363 F.3d 25, 50 (1st Cir. 2004).  The

government's "proof" consisted of a three-page form letter whose only reference to

Mr. Hallinan is recounting his medical condition, and a witness who knew almost

nothing about Mr. Hallinan's medical conditions or the ability for the Bureau of

Prisons to treat a 77 year old with multiple, severe infirmities; and everything she

did know came from a short call with another Bureau of Prisons witness that was

supposed to testify, but who had a scheduling conflict (much like Mr. Hallinan

would experience if in the custody of the Bureau of Prisons).

In stating its opinion of the expert testimony, this Court discounted the

Defendant's experts, stating that the testimony was "a little general" and did not

connect the Bureau of Prisons' inadequacies to Mr. Hallinan's case.  Sentencing

Tr. at 126.  Defendant's evidence was anything but general.  Both the Defendant's

written expert report and the testimony that was presented specifically addressed

Mr. Hallinan's medical condition and the Bureau of Prisons ability to adequately

treat Mr. Hallinan.  The defense experts actually read Mr. Hallinan's medical

records – unlike the government's expert witness.  And while the government

submitted a three-page form letter, the defense submitted a 25 page expert report, 15 pages of medical records, and citations to multiple audits by the Inspector General, National Institute of Corrections, and the United States General Accounting Office.  Defense also forwarded the personal experience of a former warden and twenty-nine year veteran of the Bureau of Prisons, and the former Assistant Director of the Federal Bureau of Prisons with responsibility for the Health Care of inmates.  Both consistently said or wrote under penalty of perjury that the Bureau of Prisons cannot take care of Mr. Hallinan without significant delays and, in Dr. Ellis's words, missteps that will endanger his life.  In short, the government's "evidence" was paltry and non-specific, and the Defendant's evidence was fulsome and focused on Mr. Hallinan's specific medical issues.

Moreover, the Court's decision as to whether the Bureau of Prisons could adequately treat Mr. Hallinan and/or to what facility he would be sent seems to have been informed by an *ex parte* communication with counsel for the Bureau of Prisons.  Early in the sentencing hearing, the prosecutor made reference to conversations he had had with the regional counsel for the Bureau of Prisons and remarked that he knew the Court had been in contact with the same person. Sentencing Tr. at 124, 203.  Defense counsel has no idea what was conveyed to the Court by the Bureau of Prisons and does not mean to attribute any inappropriate intent to the communication, but an *ex parte* call to the Bureau of Prisons

18

concerning the matters at issue in the sentencing hearing (e.g. whether the BOP can adequately treat Mr. Hallinan; to what facility he would be sent; the procedures the BOP would employ; etc) is a violation of Mr. Hallinan's due process rights. *See United States v. Hayes*, 171 F.3d 389 (6th Cir. 1999) (holding that District Court committed plain error when it considered *ex parte* victim letters in sentencing); *United States v. Green*, 544 F.2d 138 (3d Cir. 1976) (noting that *ex parte* communications are disfavored, and affirming the sentence only because they "were put on the record by the court, and full opportunity existed for cross-examination"); *United States v. Craven*, 239 F.3d 91 (1st Cir. 2001) ("In general, the law frowns upon *ex parte* communications between judges and court-appointed experts.") (holding that if the sentencing court desires additional information from an expert it must make a request for a supplemental report or bring the expert into court to be questioned in the presence of the parties).  To be clear, like the First Circuit in *Craven*, "[w]e do not doubt the trial judge's good intentions," but we respectfully submit it was nevertheless error to consult with the Bureau of Prisons before or during the sentencing hearing about the issues at the core of that hearing.

In short, the Court committed error and failed to give sufficient consideration to the Defendant's mitigation evidence, which seems to have been partly informed by an *ex parte* call with the Bureau of Prisons.  It wholly discounted Defendant's experts and embraced the government's "expert" evidence,

19

which consisted of a general form letter and a witness that had no specific information about how the Bureau of Prisons would treat Mr. Hallinan.  Doing so was reversible error.  *See United States v. Olhovsky*, 562 F.3d 530 (3d Cir. 2009) (reversing sentence that "appear[ed] inconsistent" with the expert medical testimony other than that of the government which consisted of a three-page report and a witness who did not even speak to the Defendant's treating doctor).  Again, at the very least, it is a substantial matter about which reasonable jurists could disagree.

### 3. The District Court Erred In Failing To Charge The Jury on Willfulness

Finally, an additional issue that Defendant plans to raise on appeal is the Court's failure to instruct the jury on willfulness for the RICO counts.  Prior to the jury charge, both Defendants requested that the Court instruct the jury that to violate the RICO counts, one must act willfully, i.e. with at least a general understanding that the loans violated the usury laws.  The Court initially included the charge, but then removed it.  Citing the Third Circuit Model Criminal Jury Instruction, the Court only charged the jury on knowingly and intentionally.  However, the commentary to the Model Jury Instructions specifically states that in cases where *Liporata v. United States*, 471 U.S. 419 (1985) applies, the term "'knowingly' [has] a different meaning than" that given in the instruction.  *See* Third Circuit Model Criminal Jury Instruction No. 5.02, comment at 10.  The

20

comment says that in that kind of case, the type of knowledge required to commit the offense "is similar to the most frequently used definition of 'willfully.'"  *Id.*

As charged in the Indictment, the collection of an unlawful debt under RICO is a case where *Liporata* applies and the term knowingly should have included instructions that the Defendant must act willfully.  *Liporata* concerned a Defendant convicted of food stamp fraud, which made it a crime to knowingly possess or transfer food stamps in any manner not authorized by statute.  *Id.*  The government posited that "knowingly" only pertained to the first clause – the transfer of food stamps, and it need not prove that the Defendant knew the transfer of food stamps was unauthorized.  The Supreme Court noted that criminal offenses lacking *mens rea* "have a generally disfavored status," and that particularly in light of the rule of lenity, the statute should be read such that the government must prove that the Defendant knew that his possession or transfer of food stamps was unauthorized.  Thus, "knowingly" should be interpreted to apply to both the transfer and also that the transfer was unauthorized.

RICO lacks a *mens rea* requirement.  *Genty v. Resolution Trust Corp.*, 937 F.2d 899, 908 (3d Cir. 1991) ("The RICO statute itself is silent on the issue of *mens rea* and its legislative history offers no illumination of the congressional intent on this point.").  Moreover, "[o]n its face, the definition [of a RICO enterprise] appears to include both legitimate and illegitimate enterprises within its

21

scope; it no more excludes criminal enterprises than it does legitimate ones."

*United States v. Turkette*, 452 U.S. 576, 580-81 (1981). In particular, it would be unjust to punish a defendant who collects a debt that he later learns was unlawful or turned out to be unlawful. The Court's charge, however, was only that the defendant must act knowingly, i.e. "that the defendant was conscious and aware of the nature of his actions . . . ."; and intentionally, i.e. "it was the defendant's conscious desire or purpose to act in a certain way." Tr. at 58 (11.20.17). Just as in *Liporata*, where the Court failed to instruct the jury that the Defendant generally knew that the transfer of food stamps was contrary to law, here the jury charge did not include language that Mr. Hallinan knew that the loans were usurious. Such a construction is untenable as it would criminalize defendants who had no idea of the usury laws or that he was acting unlawfully. Just as in *Liporata*, the jury should have been charged on willfulness – that the Defendant generally knew of the unlawful nature of his acts. *See United States v. Irizarry,* 341 F.3d 273 (3d Cir. 2003) ("The district court properly instructed the jury that the government is required to prove 'the defendant knowingly and willfully conducted or participated in the conduct of the enterprise's affairs through a pattern of racketeering activity,' as an element of its RICO charge."); *United States v. Gjeli*, 2015 WL 1573369, at 8 (E.D. Pa. 2015) ("At most, therefore, the government was required to prove that the defendants had knowledge of the generally unlawful nature of the particular

22

loans in question and also that it was the practice of the lenders to make such loans."); *United States v. Diecidue*, 603 F.2d 535, 548 (11th Cir. 1979) (same).

Yet again, at the very least, this issue is substantial and one over which fair minds can debate.

## B.     Mr. Hallinan Is Not A Risk Of Flight Or Danger To The Community

Notwithstanding the Court's findings at the sentencing hearing, Mr. Hallinan is not a flight risk.  The Court stated that it viewed Mr. Hallinan as a flight risk in part because of his lengthy, 168-month, sentence, which the Court assumed Mr. Hallinan did not expect.  Sentencing Tr. at 210.  Mr. Hallinan, however, did know that was a strong possibility: the April Presentence Report calculated a guidelines range of life imprisonment (indeed given Mr. Hallinan's age any lengthy sentence may effectively be a life sentence); the government requested that Mr. Hallinan receive a sentence within the guidelines; and Mr. Hallinan's co-defendant, Wheeler Neff received a sentence of eight years' imprisonment.  Moreover, even in the face of the lengthy sentence received by Mr. Neff, the government stated in response to Mr. Neff's Third Circuit request for bail that "[t]here is no dispute that Neff does not present a risk of flight or danger, and that the appeal is not for purpose of delay."  Gov't Resp. to Bond Motion, at 3.  Every indication by probation, the government, and the Court indicated that he would receive a lengthy sentence and

yet Mr. Hallinan appeared as he did every day of the trial, every court conference, and every visit to probation.

Moreover, Mr. Hallinan already has a set of conditions that will assure that he will not flee. Indeed, the Court already found that even though it viewed Mr. Hallinan as a risk a flight, "stringent conditions may be imposed pursuant to 18 U.S.C. § 3142(c) that will reasonably assure his appearance." [Dkt. 507]. Namely, Mr. Hallinan has put up a $1,000,000 bail secured by his home and $100,000 in cash. The government is wrong in arguing that the home has been forfeited and thus cannot be used as collateral. Mr. and Mrs. Hallinan own the home equally as tenants of the entireties. As such the government is prevented from selling or otherwise evicting Mrs. Hallinan from their home. Mrs. Hallinan has, by signing the bail, put her interests up in the home and any misstep by Mr. Hallinan would cause it to be lost. Additionally, Mrs. Hallinan has agreed to be a custodian of Mr. Hallinan, again to be responsible if he were to flee. Mr. Hallinan also has an ankle bracelet and is subject to daily, unannounced visits by probation.

Finally, Mr. Hallinan has the most stringent bail condition imaginable: his life. As the Court is aware and as described above, Mr. Hallinan is undergoing intensive treatment for two aggressive cancers and an underlying heart condition. As noted by Dr. Ellis, he requires a team of doctors to manage his infirmities and

the slightly delay will imperil his life.  If Mr. Hallinan were to flee and interrupt this treatment, his life would be in danger.

## **CONCLUSION**

For all of the reasons stated above, Mr. Hallinan respectfully requests that the Court release him on bail pending appeal.  He is not a flight risk, the issues on appeal are substantial, and submitting to the custody of the Bureau of Prisons will interrupt his cancer treatment and will endanger his life.  To the extent the Court has already ruled on many of these issues and is inclined to deny the motion, Defendant requests that the motion be heard expeditiously so as to allow an appeal to the Third Circuit.

Dated:    July 10, 2018                **JACOBS & BARBONE, P.A.**

By:   *s/ Edwin J. Jacobs, Jr.*
       Edwin J. Jacobs, Jr.
       1125 Pacific Avenue
       Atlantic City, NJ 08401
       (609) 348-1125


**KATTEN MUCHIN ROSENMAN LLP**

By:   *s/ Michael M. Rosensaft*
       Michael M. Rosensaft
       575 Madison Avenue
       New York, New York 10022-2585
       (212) 940-8800 (phone)
       (212) 940-8776 (fax)


**STRADLEY RONON STEVENS &
YOUNG LLP**

By:   *s/ Andrew K. Stutzman*
       Andrew K. Stutzman
       2005 Market Street, Suite 2600
       Philadelphia, PA 19103
       (215) 564-8000 (phone)
       (215) 564-8120 (fax)


*Attorneys for Appellant Charles M. Hallinan*

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served upon all counsel of record in this case by filing on the Court's Electronic Case Filing System on July 10, 2018.

By:        *s/ Michael M. Rosensaft*
Michael M. Rosensaft
*Counsel for Appellant Charles M. Hallinan*