# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA  :

    v.                :   **Crim. No. 16-130-01**

CHARLES M. HALLINAN      :

## GOVERNMENT'S REPLY IN OPPOSITION TO DEFENDANT'S MOTION FOR BAIL PENDING APPEAL

Defendant Charles M. Hallinan, who was sentenced to 168 months' imprisonment and other penalties, and ordered to surrender on July 30, 2018, seeks bail pending appeal. He asserts that he meets the requirements set forth in 18 U.S.C. § 3143(b).

Hallinan devotes a large portion of his motion to assertions that he is in poor health and requires medical treatment. *See, e.g.,* Mtn. 1-9. But those facts, standing alone, are not a basis for bail pending appeal under Section 3143(b). Rather, this was an issue for sentencing, at which this Court, after exhaustive proceedings, weighed all of the pertinent sentencing considerations and determined that Hallinan should be imprisoned for his extensive crimes, and not receive a variance due to his health.

At this time, to obtain bail, Hallinan must meet the statutory requirements, that is, he must establish that he is not a risk of flight, that the appeal is not for purposes of delay, that he will present substantial issues for review on appeal,

and that success on those issues will lead to a term of imprisonment less than the time spent to adjudicate the appeal. Hallinan does not meet this test. Rather, he in fact presents a risk of flight, and none of the issues he identifies – (1) the admission of a July 2013 email at trial; (2) the Court's decision to discount the testimony of a defense medical expert at sentencing; and (3) the sufficiency of the Court's jury instructions on the RICO counts regarding mens rea – warrant bail pending appeal under the pertinent standard. Accordingly, the motion should be denied.

## I.    Statement of Facts.

On November 27, 2017, following a two-month trial, a federal jury convicted Hallinan of two counts of conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), in violation of 18 U.S.C. § 1962(d) (Counts 1 and 2); one count of conspiracy to commit mail fraud, wire fraud, and money laundering, in violation of 18 U.S.C. § 371 (Count 3); two counts of mail fraud and aiding and abetting, in violation of 18 U.S.C. §§ 1341 and 2 (Counts 4 and 5); three counts of wire fraud and aiding and abetting, in violation of 18 U.S.C. §§ 1343 and 2 (Counts 6, 7, and 8); and nine counts of international money laundering and aiding and abetting, in violation of 18 U.S.C. §§ 1956(a)(2)(A) and 2 (Counts 9 through 17). The jury also convicted Hallinan's co-defendant and former attorney, Wheeler K. Neff, on Counts 1 through 8.

In brief summary, Hallinan participated in two separate conspiracies to collect unlawful debt from so-called "payday loans," which were short-term consumer loans that had annual interest rates exceeding 780 percent. One conspiracy involved companies that Hallinan owned, operated, controlled, and financed (the "Hallinan Payday Loan Organization"), and the other involved companies owned and controlled by Adrian Rubin (the "Rubin Payday Loan Organization"). Both organizations tried to evade state usury laws by, among other things, entering into sham arrangements with Indian tribes that were designed to give the false impression that the tribes owned the payday loan companies, so that the tribes could claim "sovereign immunity" from laws that they did not want to follow. On an audio recording played for the jury, Hallinan described these tribal arrangements as "farces."

Hallinan also conspired with Neff and others to defraud 1,393 Indiana residents who had brought a class action lawsuit against one of Hallinan's payday loan companies into believing that the company was effectively judgment proof so they would abandon claims Neff thought were worth up to $10 million. More specifically, Hallinan and Neff devised and participated in a scheme to deceive the class plaintiffs into believing that Hallinan had sold Apex 1 Processing, Inc. ("Apex 1") to an entity owned by co-defendant Randall P. Ginger, a self-proclaimed "hereditary chief" of the Mowachaht/Muchalaht First Nation ("MMFN") in Canada, and that Apex 1 had few assets that could be recovered if the plaintiffs prevailed in their lawsuit. Hallinan boasted to Rubin in one audio

recording that he had offered to pay Ginger $10,000 a month for Ginger's participation in this fraud scheme. Bank records confirmed that Hallinan had made $10,000 payments from the United States to Ginger in Canada each month from August 2013 through April 2014.

## II.    Applicable Standards.

Pursuant to 18 U.S.C. § 3143(b), bail pending appeal is available only in limited circumstances. The statute provides:

> [T]he judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained, unless the judicial officer finds—
>
> (A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; and
>
> (B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in—
>
> (i)     reversal,
>
> (ii)    an order for a new trial,
>
> (iii)   a sentence that does not include a term of imprisonment, or
>
> (iv)    a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.
>
> If the judicial officer makes such findings, such judicial officer shall order the release of the person in accordance with section 3142(b) or (c) of this title, except that in the circumstance described in subparagraph (B)(iv) of this paragraph, the judicial officer shall order the detention terminated at the expiration of the likely reduced sentence.

Thus, as the Third Circuit has summarized, bail pending appeal may be granted only if the defendant establishes:

(1) that the defendant is not likely to flee or pose a danger to the safety of any other person or the community if released;

(2) that the appeal is not for purpose of delay;

(3) that the appeal raises a substantial question of law or fact; and

(4) that if that substantial question is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial of all counts on which imprisonment has been imposed.

*United States v. Miller*, 753 F.2d 19, 24 (3d Cir. 1985).

In determining this motion, the Court must be mindful of the legislative preference that a defendant be incarcerated upon the imposition of sentence. As the Third Circuit Court explained in *Miller*, the manifest purpose of Congress in enacting this provision of the Bail Reform Act of 1984 was to reverse the presumption of bail which applied under prior law in this situation. *Id.* at 22. Under the Act, the instances of bail pending appeal should be "considerably reduced in number." *Id.* at 24.

*Miller* quoted favorably from a 1970 House report, written at the time Congress, writing legislation for the District of Columbia, first adopted the provision which became applicable nationwide in 1984:

[O]nce a person has been convicted and sentenced to jail, there is absolutely no reason for the law to favor release pending appeal or even permit it in the absence of exceptional circumstances. First and most important, the conviction, in which the defendant's guilt of a crime has been established beyond a reasonable doubt, is presumably correct in law,

a presumption factually supported by the low rate of reversal of criminal convictions in the Federal system. Second, the decision to send a convicted person to jail and thereby reject all other sentencing alternatives, by its very nature includes a determination by the sentencing judge that the defendant is dangerous to the person or property of others, and dangerous when sentenced, not a year later after the appeal is decided. Third, release of a criminal defendant into the community, even after conviction, destroys whatever deterrent effect remains in the criminal law. Finally . . . the purpose of the appellate process is not to give a convicted criminal, by means of release pending appeal, an opportunity to demonstrate a basis for reducing a sentence after the conviction has been affirmed.

*Miller*, 753 F.2d at 22 (quoting H. Rep. No. 907, 91st Cong., 2d Sess. 186-87

(1970)).[1]

## III.   Discussion.

The government does not assert that Hallinan's appeal is for purpose of delay. However, he presents a risk of flight, and he does not present any substantial issue for appellate review. For either reason, the motion for bail should be denied.

### A.   Risk of Flight.

At the sentencing hearing, this Court concluded that Hallinan was a "risk of flight" for six reasons: (1) because even though Hallinan might have known a prison sentence was possible, he never really "thought this day was coming"; (2) "he's now facing a substantial sentence of 14 years," which certainly provides

---

[1] If this Court denies bail, and Hallinan seeks review of that action, the Court of Appeals will exercise plenary review, but should "accord some deference to the district court's reasoning" in denying bail. *United States v. Smith*, 793 F.2d 85, 87 (3d Cir. 1986).

him an incentive to flee; (3) "he has shown no remorse and no contrition," which suggests Hallinan in not ready to accept the term of imprisonment as just punishment; (4) "he has been found to have obstructed justice"; (5) many of the assets posted as bond previously will be subject to forfeiture; and (6) "we don't really know the extent of the assets that he has and to what extent those assets could be secured and hidden and facilitate flight." Sent. Tr. 209-10. This Court added that although Hallinan "is certainly suffering a serious medical condition, there is no immediate medical emergency."

Hallinan only addresses a few of the Court's concerns in his motion for bail pending appeal, and even with those, he does nothing more that reiterate arguments he had raised previously. For example, Hallinan states that before the hearing, he was well aware that a 168-month prison sentence was possible since the Probation Office's Presentence Investigation Report (PSR) had determined that Hallinan's sentencing range under the Guidelines was "life" imprisonment, the government was recommending a within-Guidelines sentence (which the government stated was 188-235 months), and Hallinan's co-defendant, Wheeler K. Neff, had been sentenced to eight years' imprisonment. Mtn. 23. Hallinan also claims that his wife has posted their Villanova home and he has posted $100,000 cash as security in case he were to flee. Mtn. 24. Hallinan, however, never responds to the Court's concerns that he has shown no remorse or contrition, suggesting an unreadiness to accept imprisonment as just punishment; that he has a record of obstructing justice; and that Hallinan may have hidden millions of

dollars of assets that would enable him to flee the country and shrug off the loss of $100,000 and his wife's interest in their Villanova house (while still obtaining any necessary medical care). These omissions are fatal to Hallinan's position, since he has the burden of proving by clear and convincing evidence that he is not a flight risk.

The fact that Hallinan has an ankle bracelet and is subject to daily, unannounced visits by Pretrial Services provides insufficient comfort that he will not flee the country at the first opportunity. Ankle bracelets have been cut before, and prisoners have left behind assets far more valuable than $100,000 and a spouse's marital interest in a house. Moreover, Hallinan's suggestion that he has "the most stringent bail condition imaginable: his life," Mtn. 24, and that fleeing the country would be tantamount to committing suicide is based on the flawed premise that he can only receive the medical treatment he needs in the United States of America. Nothing in Hallinan's motion explains why Hallinan would not be able to get the treatment he needs in a foreign country, including a country that does not have an extradition treaty with the United States.

Hallinan has chosen not to be communicative with the Court about his financial resources. Although he has a right to remain silent, Hallinan's exercise of that right with regard to his finances makes it impossible for him to prove by "clear and convincing evidence" that he is not a flight risk. *United States v. Strong*, 775 F.2d 504, 505 (3d Cir. 1985). As explained in prior filings, the Fifth Amendment is not violated by putting a defendant to a choice between providing

truthful information or waiving his right to make certain arguments to the Court. *See McGautha v. California*, 402 U.S. 183 (1971) ("Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose."). Indeed, the Supreme Court and the Third Circuit have long held that the Fifth Amendment does not prohibit requiring a defendant to choose between testifying or risking a death sentence, *Crampton v. Ohio*, 402 U.S. 183 (1971) serious prison administrative sanctions, *Baxter v. Palmigiano*, 425 U.S. 308 (1976); loss of a job through administrative disciplinary proceedings, *DeVita v. Sills*, 422 F.2d 1171 (3d *Cir.* 1970); and loss of eligibility for the so-called "safety valve" provision in the sentencing guidelines, *United States v. Warren*, 338 F.3d 258 (3d Cir. 2003). Hallinan has had numerous opportunities to provide information to this Court about his finances for the purposes of allaying the concerns the Court raised at the sentencing hearing. Hallinan has missed each opportunity, including in his motion for bail pending appeal. As a result, he has failed to prove by clear and convincing evidence that he is not a flight risk.

To be sure, in its order on July 6, 2018 (docket entry 507), while stating that Hallinan presents a risk of flight, the Court concluded that "stringent" conditions permitted his release pending reporting to prison (then scheduled for July 17, 2018, and later extended to July 30, 2018). Those unusual conditions included committing the defendant to the custody of his spouse, directing Pretrial Services to make an unannounced home visit at least once per day, and requiring

a $1 million bond with 10% cash. Obviously, such conditions, which are particularly burdensome on the Pretrial Services Office, would not be imposed over the long-term duration of an appeal, and without such conditions, Hallinan presents a risk of flight. Accordingly, the motion for bail pending appeal must be denied.

## B.    Substantial Issue Requirement.

Even if Hallinan could meet his burden of proving by clear and convincing evidence that he is not a flight risk – and he cannot – his motion for bail pending appeal should be denied unless he identifies a "substantial" issue for appeal. An issue qualifies as "substantial" only where it is "fairly debatable," *United States v. Smith*, 793 F.2d 85, 89 (3d Cir. 1986), and would result in a term of imprisonment less than the time already served plus the duration of the appeal. Hallinan purports to identify three "substantial" issues for review: (1) the Court's admission of a July 2013 email at trial; (2) the Court's alleged "failure" to consider Hallinan's medical situation when sentencing him; and (3) the Court's decision to track the Third Circuit's Model Jury Instructions when charging the jury on the elements of a RICO conspiracy. None suffices.

### 1.    Success on appeal would likely not result in a term of imprisonment less than the likely duration of the appeal.

Under Section 3143(b)(1)(B)(iv), a substantial issue is one which, in part, is "likely to result" in "a reduced sentence to a term of imprisonment less than the

total of the time already served plus the expected duration of the appeal process." It is likely that Hallinan's motion does not pass this test.

His objection to the introduction of a July 2013 email relates only to the fraud on class action plaintiffs, which is the subject of Counts 3 through 17 of the indictment. His objection to the RICO jury instructions relates only to Counts 1 and 2 of the indictment, which concern his collection of unlawful debts through payday lending entities. The Court imposed concurrent 168-month terms on Counts 1, 2, and 4 through 17. Moreover, the Sentencing Guidelines applicable to either set of charges would support, independently, a sentence far in excess of the likely duration of the appeal (about a year). Accordingly, in order to materially affect his sentence as required by Section 3143(b), Hallinan would have to prevail on *both* issues. Each issue standing alone, under the statute, does not present a substantial question for appeal as that term is defined in the statute.

As for the objection to the Court's consideration of evidence at sentencing regarding medical condition, in order to present a substantial issue, Hallinan would have to show that success on the issue would lead to a sentence of less than a year. Given the fact that the Court deemed Hallinan's crimes, notwithstanding his age and medical condition, to be so serious as to justify a 14-year sentence, the likelihood that it would instead relieve Hallinan of incarceration entirely as a result of his medical condition is essentially nil. For this reason, the objection does not qualify under the bail statute as a substantial question.

### 2.    Admission of the July 2013 email does not present a substantial issue.

Putting aside the fact that, as explained above, the objection to the July 2013 email does not present a substantial question of review standing alone, because it would not result in a term of imprisonment less than the likely duration of the appeal, the issue also is not substantial because it is meritless.

With regard to the July 2013 email, Hallinan claims that when the government moved *in limine* to admit the email at trial, it failed to articulate the basis for admitting the email under the crime-fraud exception to the attorney work product doctrine. Mtn. 11-16. More specifically, Hallinan claims that when the government moved to admit the email, it argued only that the email furthered "amorphous 'tax crimes,'" Mtn. 11, and that the government "only recently enumerated the 'tax crimes' to which it was referring in its motion *in limine*," Mtn. 13. Hallinan asserts that the government did not "give a straight answer" as to the specific tax crimes that were potentially furthered by the email until the government responded to Neff's recently filed motion for bail pending appeal. Mtn. 13.[2] Hallinan is mistaken. As detailed below, the government clearly articulated the specific tax crimes that were at issue at the August 11, 2017, hearing that this Court held on numerous pretrial motions, including the government's motion *in limine* to admit the email.

---

[2] The Third Circuit denied Neff's motion without prejudice because he did not first seek such relief in this Court. Neff then chose not to move for bail pending appeal.

As the Court will recall, Hallinan's accountant, Rod Ermel, had produced the email to the government in December 2014 along with other documents responsive to grand jury subpoenas. The email, which Ermel received from Hallinan on July 16, 2013, contained a previous email that Hallinan had received from Neff on Jul 12, 2013. Neff's email referenced the Indiana lawsuit against Apex 1 and warned Hallinan that he faced exposure of up to $10 million if the plaintiffs could prove that he had not really sold Apex 1 to Ginger. Neff urged Hallinan to direct Ermel to "correct" Hallinan's previous tax returns to identify Ginger as the owner of Apex 1. Neff also stated that "for settlement discussion purposes," it would be important for Apex 1 not to do any more business, and that it would be "helpful" to have all of Apex 1's business activity "discontinued and retroactively transferred to another one of your many operating companies for that entire 2013 year. All that will tend to confirm that Ginger owned Apex 1 and there are only a minimum amount of assets available for settlement which could possibly be supplement[ed] by some of the receivable amount due Apex 1 as well."

The day after Ermel produced this email to the government, his lawyer sought to recall it on grounds that it was privileged and had been inadvertently included in Ermel's production. After some correspondence with Hallinan's counsel, the government filed a motion with the grand jury judge for permission to present the email to the grand jury. The government served copies of its

motion on counsel for both Hallinan and Neff. Hallinan objected to the government's motion on privilege grounds. Neff did not raise any objection.

On June 1, 2015, the grand jury judge granted the government's motion, holding that the crime-fraud exception pierced Hallinan's privilege claim. Hallinan appealed that ruling to the Third Circuit. No stay was entered, and the government presented the email to the grand jury.

On October 28, 2016, a divided panel of the Third Circuit dismissed Hallinan's appeal on jurisdictional grounds and affirmed the grand jury judge's ruling. Hallinan, however, filed a motion for panel rehearing or rehearing *en banc*, and on January 27, 2017, the panel issued a new order, which vacated its prior ruling, granted panel rehearing, and held that: (a) the Court did have jurisdiction to consider Hallinan's appeal; and (b) the crime-fraud exception did not apply to the email. *In re Grand Jury Matter #3*, 847 F.3d 157, 160 (3d Cir. 2017).

The Court stated that a "party seeking to apply the crime-fraud exception must demonstrate that there is a reasonable basis to suspect (1) that the [lawyer or client] was committing or intending to commit a crime or fraud, and (2) that the...attorney work product was used in furtherance of that alleged crime or fraud." *Id.* at 165 (quoting *In re Grand Jury (ABC Corp.)*, 705 F.3d 133, 155 (3d Cir. 2012)). The Court found that although the government "can readily satisfy the first requirement," because "there is at least a reasonable basis to believe" Hallinan committed a fraud against the Indiana plaintiffs, the government

had not satisfied the second requirement. *Id.* at 165-66.  The Court added,

"[n]one of this should suggest that, in the event [Hallinan] is convicted (based on

the superseding indictment) and appeals, he should automatically get a new trial

because the Government used the protected work product." *Id.* at 167. "That is

because the Government could avoid a retrial by showing the error was

harmless." *Id.* (citing *Bank of Nova Scotia v. United States*, 487 U.S. 250, 255-56

(1988)). The Court issued an order remanding the case to the district court "for

further proceedings consistent with this opinion."

On January 17, 2017, ten days before the Third Circuit issued its ruling, the

defendants filed a motion *in limine* in this Court to bar the admission of the

July 12, 2013, email at the trial. The defendants subsequently sought dismissal of

the indictment or various counts based on the grand jury's consideration of the

email. On February 8, 2017, the government moved *in limine* to admit the email

at trial. The government's motion was based on evidence and arguments that had

not been part of the record before the Third Circuit when it issued its January 27,

2017, ruling. The government argued that there was at least a reasonable basis to

suspect that: (1) in addition to defrauding the Indiana plaintiffs, Hallinan also

had committed several tax crimes; and (2) the July 12, 2013, email was used in

furtherance of those tax crimes. The government also argued that the email was

at least admissible against Neff, if not Hallinan, because he had never opposed

the government's motion to the grand jury judge, so he had waived any privilege claim he might have once been able to assert.[3]

On August 11, 2017, this Court held a hearing on numerous pretrial motions, including the defendants' motion to bar the use of the July 12, 2013, email at trial, the defendants' second motion to dismiss the indictment, and the government's motion *in limine* to admit the email at trial. Ermel testified at the hearing. Tr. 54-131. Among other things, Ermel testified that:

- Since Apex 1 was an S-Corporation, if Hallinan had sold it in 2008 to an entity such as Aboriginal GR Financial, as the defendants had claimed, that sale would have had to be reported to the IRS, because Apex 1 would no longer have been entitled to S-Corporation status. Tr. 71.

- Ermel did not recall ever reporting to the IRS that Hallinan had sold Apex 1 to Aboriginal GR Financial, Ginger, or anyone else. Tr. 71.

- Even after an entity stops doing business, it has an obligation to file tax returns with the IRS, until it files a return identified as the "final return." Tr. 75-76.

- Ermel never prepared or filed a "final return" for Apex 1. Tr. 76.

- Apex 1, in particular, would still have had an obligation to file tax returns with the IRS, until such time as it provided a notice stating "final return." Tr. 79.

- If Hallinan still owned Apex 1, he had a continuing obligation to report his interest in the company to the IRS on his personal tax returns. Tr. 79.

---

[3] The government also argued that it had additional evidence that Hallinan had used the July 12, 2013, email to defraud the Indiana plaintiffs, which it had been precluded from presenting on appeal, pursuant to Fed. R. App. 10(a), because such evidence had not been part of the grand jury record.

- Ermel did not file any tax returns for Apex 1 for tax years 2013, 2014, 2015, or 2016. Tr. 79.

- In 2015, Ermel helped navigate Hallinan through an IRS audit. Tr. 81. In connection with that audit, Hallinan signed paperwork on February 19, 2015, in which he represented to the IRS that he owned Apex 1 in tax year 2012 and did not own it in tax year 2013. Tr. 86.

- Other than the email Ermel received from Hallinan on July 16, 2013, which forwarded the July 12, 2013, email that Hallinan had received from Neff, the only representations that Ermel ever received to suggest that Hallinan did not own Apex 1 were emails that he received from Neff in late 2014, which purported to show that Ginger owned Apex 1. Tr. 89-90.

- As of December 1, 2014, Ermel had received documentary evidence from Neff that contradicted tax returns he had previously filed with the IRS at the direction of Hallinan and his agents, regarding who owned Apex 1 and three other payday lending companies for tax years 2010 through 2012.[4] Tr. 101.

- Ermel was instructed by one of Hallinan's attorneys, Andrew Stutzman, not to amend any of the tax returns on file with the IRS that related to Hallinan's ownership of Apex 1 and the other three companies. Tr. 102.

After Ermel finished testifying, this Court heard argument from the government and the defendants on the admissibility of the July 12, 2013, email. This Court, however, stated that any argument must be limited to the question of whether the email was used to further some crime or fraud that had not been considered by the Third Circuit. This Court stated, "I mean I'm not going to

---

[4] Those companies are Fifth Avenue Financial, Inc., Sabal Financial, Inc., and Palmetto Financial, Inc. Prior to July 16, 2013, Ermel had prepared personal tax returns for Hallinan and corporate returns for those three entities, all of which identified Hallinan as the 100 percent owner of the companies.

overrule what they did. You have to persuade me that this is some other crime

and under the law I am permitted to look at." Tr. 117.

>   The government argued as follows:
>
>   Willful failure to file tax returns is a federal crime. Tax evasion is a federal
>   crime. If we can show that there's a reasonable basis to suspect that there's
>   a reasonable basis to suspect that the July 16, 2013 email was used to
>   further either of those crimes, that's sufficient. No tax returns were filed for
>   2013, '14, '15, and not yet for '16 for Apex 1 Processing. Charles Hallinan
>   did not identify Apex 1 Processing as one of his companies for 2014, '13, '15,
>   or '16. We therefore meet the first prong of the Third Circuit's test. We have
>   provided evidence to show that there's a reasonable basis to suspect that
>   Mr. Hallinan committed or aided and abetted the commission of the
>   crimes of willful failure to file tax returns...and tax evasion.
>
>   The second prong, whether he used the email, we have provided evidence
>   that at the time Mr. Ermel was making decisions he had only received
>   communications from Mr. Neff, Mr. Hallinan and Mr. Hallinan's agent,
>   which was Mr. Stutzman. The options, there are very few as to what would
>   have prompted him – what would have prompted him to prepare tax
>   returns that have false information on them. What would have prompted
>   him to not fulfill his duty as an accountant and correct the record? The only
>   thing is, and it's a trail of evidence that starts with that email on July 16,
>   2013 and continues to this day, and it just has to be part of the trail. But the
>   reason why we have reason to suspect that Charles Hallinan and Wheeler
>   Neff are aiding or abetting or committing, themselves, the willful failure to
>   file tax returns and tax evasion is because of a slew of evidence that
>   includes but is not limited to that July 16,...2013 email.

Tr. 129-31.

>   As the transcript shows, Hallinan is simply wrong when he says that the

government only "recently enumerated" the tax crimes furthered by the disputed

email. The government identified those tax crimes before the email was admitted

at trial. The government also explained why there was a reasonable basis to

suspect that (1) Hallinan committed those tax crimes and that (2) the July 12,

- 18 -

2013, email had been used to further those tax crimes. These are not, as Hallinan alleges in his motion for bail, some "*post hoc* rationalizations with a temporal disconnect to the July 2013 legal advice contained in the email." Mtn. 13. These were explanations provided by the government before the Court issued its rulings.

It was therefore unsurprising that on August 15, 2017, this Court issued an order that, *inter alia*, denied the defendants' motion to bar the use of the July 12, 2013, email at trial and granted the government's motion *in limine* to admit the email. This Court wrote:

> In January 2017, the Third Circuit ruled that the email at issue was not subject to the crime-fraud exception to the privileges because there was not a reasonable basis to believe the email had been used in furtherance of the crime or fraud identified by the Government. That decision did not, however, foreclose the possibility that the email was used in furtherance of a <u>different</u> crime or fraud, and thus still subject to the crime-fraud exception. Indeed, for the reasons argued by the Government at the August 11 hearing, the Court finds that there is a reasonable basis to suspect that (1) the defendants were committing or intending to commit tax crimes, and (2) the email was used in furtherance of those crimes. *See In re Grand Jury*, 705 F.3d 133, 155 (3d Cir. 2012). Accordingly, the email is subject to the crime-fraud exception and may be used as evidence at trial.

Order at 2 n.2 (emphasis in original).[5]  In the same Order, this Court denied the defendants' second motion to dismiss.

On December 4, 2017, one week after the jury convicted Hallinan and Neff on all charges, this Court issued a memorandum that explained the basis for

---

[5] *United States v. Hallinan*, 2017 WL 3530845 (E.D. Pa. Aug. 15, 2017).

several midtrial rulings on privilege issues separate from those relating to the July 12, 2013, email. In this memorandum, this Court again referenced the Third Circuit's January 27, 2017, ruling and reiterated that, "[a]lthough the Third Circuit found that the crime-fraud exception did not apply to the July 12, 2013, email, the Court later permitted the Government to introduce the email at trial because there was a reasonable basis to suspect that Hallinan used the advice in the email in furtherance of a different crime or fraud." Mem. at 19 n.9. "Specifically, following a hearing held prior to trial, the Court found that there was a reasonable basis to suspect that Defendants were committing or intending to commit tax crimes, and that the July 12, 2013, email was used in furtherance of those crimes." *Id.*

The issue of whether this Court properly admitted the email as evidence for trial will be reviewed on appeal for abuse of discretion. *In re Grand Jury*, 705 F.3d at 155; *In re Impounded*, 241 F.3d 308, 312 (3d Cir. 2001). "To show an abuse of discretion, appellants must show the district court's action was 'arbitrary, fanciful or clearly unreasonable.' *Stich v. United States*, 730 F.2d 115, 118 (3d Cir.1984). We will not disturb a trial court's exercise of discretion unless 'no reasonable person would adopt the district court's view.' *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir.2000)." *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 412 (3d Cir. 2002). Hallinan does not even address his appellate burden, let alone explain how he hopes to meet it. Instead, he criticizes the government for presenting the jury with evidence that this Court deemed

admissible. In the process, Hallinan implicitly accuses this Court of "contravening" the Third Circuit. Mtn. 16. This Court did no such thing. To the contrary, this Court fully understood and properly applied the Third Circuit's rulings and acted within its discretion when it admitted the email as evidence for trial.

Hallinan states that the email was not in furtherance of any later tax crime, because it specifically referred only to amending past returns. Mtn. 13. But in fact, the email was the basis of a series of actions, including the failure to file future returns, as part of a continuing plot to misrepresent Hallinan's control of Apex 1. The Court certainly did not abuse its discretion in so concluding.

Hallinan also states that the email was not in furtherance of a crime because Ermel simply filed it and did not later rely on it. That is debatable – the email supported the fiction that Hallinan did not own Apex 1 and was known to Ermel as he took actions thereafter. But in any event, the question is not whether the email succeeded in furthering a crime; it is whether it was sent in furtherance of a crime such that it is not protected under the work product privilege.

Hallinan also does not address the fact that the email in question was just one piece of an avalanche of evidence of his illegal conduct, such that any incorrect admission of the email would be harmless, and he will not receive a new trial on this basis. There is nothing "substantial" about Hallinan's challenge to this Court's evidentiary ruling.

### 3.  The Court's review of the medical evidence at sentencing does not present a substantial question.

In his motion for bail pending appeal, Hallinan argues that the appeal raises a substantial question as to whether this Court erred at sentencing by discounting the defendant's expert witnesses who opined that BOP would be unable to adequately treat his medical conditions in prison, and crediting the government expert's conclusion that BOP could provide adequate medical care for Hallinan. Mtn. 16-20. Notably, Hallinan presents no new evidence regarding his medical condition but merely repeats the same arguments made at sentencing, contending that the government "made no showing" that the BOP "could ever adequately care for him." Mtn. 9. This Court had already entertained and rejected Hallinan's arguments, and Hallinan points to no error, let alone clear error, in the Court's findings. Rather, Hallinan merely substitutes his assessment of the evidence for that of the Court. His argument does not present a substantial question on appeal, and does not provide a basis for release pending appeal.

As explained earlier, the objection does not present a substantial question of review standing alone, because it would not result in a term of imprisonment less than the likely duration of the appeal. Moreover, the issue is entirely meritless.

The record drives this point home. In his sentencing memorandum and at the sentencing hearing, Hallinan sought both a downward departure and a

downward variance on the basis of his medical condition, and submitted medical records regarding his condition. It was undisputed that Hallinan had been diagnosed with bladder cancer, prostate cancer, heart disease, and coronary artery disease, and was undergoing chemotherapy for his bladder cancer. Hallinan submitted the affidavit of Philip Wise, a former assistant director of the BOP, who opined that the BOP was "ill-equipped to manage the needs of elderly patients, particularly those with serious medical issues, like Mr. Hallinan," Sent. Tr. 80, and it was likely that a "misstep" would occur in the course of Hallinan's treatment. Mtn. 6-7. Wise stated that in his opinion, Hallinan would likely be designated to the BOP Federal Medical Center in Butner, North Carolina. Tr. 92-93. The government submitted an expert report in the form of a letter from BOP regional health services administrator Janet Bunts, stating that she had reviewed Hallinan's medical records, and that the BOP would be able to provide appropriate medical care for Hallinan. The letter outlined the BOP's four "care levels" and the treatment and designation protocols for these various levels.

At the sentencing hearing, Michelle Baker-Bartlett, a captain in the United States Public Health Service and the Health Services Administrator at the Federal Detention Center, verified that she had reviewed Bunts' letter and spoken to Bunts about the matter. Tr. 40-41. She testified that Bunts had relayed that approximately 350 cancer patients were currently designated to the BOP medical facility in Butner, North Carolina, and the facility had treated six prostate cancer patients in June 2018. Tr. 47-48.

Hallinan in turn presented as his expert Maureen Baird, a former warden and administrator for the BOP. Tr. 66. Baird stated that she had reviewed Hallinan's medical records and endorsed Wise's conclusions, adding that in her opinion, none of the federal medical centers could adequately treat Hallinan given his age and his medical condition. Tr. 69, 71-72. She opined that there was no "guarantee" that BOP staff would be able to take Hallinan to an outside facility for treatment in a timely manner. Tr. 74. Baird also agreed that there was no guarantee that there would not be a "misstep" along the way due to circumstances beyond the control of BOP, such as staffing issues. Tr. 75, 79-80. Baird described Janet Bunts' letter as "pretty much a form letter," but admitted that in her many years at BOP, Baird herself had "never once, in a letter, stated the Bureau of Prisons could not handle an offender." Tr. 69.

After ruling on Hallinan's objections to the guideline calculation, the Court determined that that the total offense level was 36, and Hallinan was in criminal history category I, which resulted in an advisory guideline range of 188 to 235 months. Tr. 102-03. Hallinan sought both a departure and a variance on the basis of his medical condition and age, and asked the Court to impose a non-custodial sentence. Hallinan dismissed the government's evidence that the BOP could provide appropriate care as nothing more than a standard form letter that did not adequately address Hallinan's situation. Tr. 114-16, 128. Hallinan argued that the Court should credit the conclusion of his expert witnesses that the BOP could not provide an adequate level of medical care for him. Tr. 128.

In responding to Hallinan's argument, the Court noted that the defense phrased the inquiry as whether the BOP could guarantee that there would be no missteps, when no institution could make such a guarantee, and that the appropriate inquiry was whether the BOP could provide appropriate treatment. Tr. 112-13, 118. The Court found that Hallinan had not shown that the BOP protocols were inadequate under the circumstances of this case. Tr. 126. The Court observed that Hallinan's expert witness "seemed a little general" and "had a lot of complaints about lack of staffing" and "various other problems" at the BOP, but said she "did not connect those inadequacies to this particular case." The Court further observed that her testimony that "something could happen" was just speculation. *Id.*

The Court cited the government's evidence regarding the number of cancer patients being treated at the Butner facility. Tr. 129. The Court found that the government had demonstrated that it had a treatment protocol "that fit the defendant's condition," and "which, on its face, meets or fits the conditions which are present in this case," while Hallinan's position "overstated the case," as no medical institution could guarantee that no "missteps" would occur. Tr. 130. The Court concluded that the government had shown that BOP could provide appropriate medical care for Hallinan. The Court again stated that it found both the affidavit and the testimony that was presented by the defendant's experts "general and conclusory," and not directly directed at the defendant's specific conditions, and that defense's experts did not relate the alleged gaps or

deficiencies in staff and budget to the conditions at issue here. Tr. 130-31. While acknowledging that Hallinan's condition was "serious, perhaps even very serious," the Court also observed it was "not an emergency, in terms of time; that is, appointments can be rescheduled, treatment can be rescheduled," which would be feasible and within BOP's protocols. *Id.*

Although the Court denied the request for a departure based on the defendant's medical condition, it found that a departure was warranted based on a combination of the defendant's age and his medical condition, and granted a two-level downward departure on this basis. Tr. 131-32. This resulted in a guideline range of 151 to 188 months. Tr. 158.

Hallinan's counsel asked the Court to vary from this range and impose a probationary sentence or house arrest, or a sentence that otherwise was "of a duration which presents the possibility that Hallinan could serve it, get some degree of medical treatment, and emerge in time to cure the cancer." Tr. 137. Counsel again reviewed the conclusions in Wise's report, arguing that they fully supported the requested variance. Tr. 141-46.

After reviewing the Section 3553(a) factors, the Court imposed a sentence of 168 months' imprisonment. Tr. 160-64. After it announced the sentence, the Court specifically asked whether there was any "procedural irregularity or objections" concerning the proceeding, noting the Third Circuit's decision in *United States v. Flores-Mejia,* 759 F.3d 253 (3d Cir. 2014) (en banc). Hallinan's counsel responded in the negative. Tr. 165.

- 26 -

During the hearing, turning to the subject of bail, government counsel stated that he had learned from BOP that Hallinan would likely be designated to Butner, and that he understood the Court had had some communication with this same BOP person regarding Hallinan's designation. Tr. 124. Before the Court addressed the issue of whether Hallinan should be released on bail or taken into custody, the government stated that it had learned from BOP regional counsel that there was space available at Butner, and Hallinan would likely be designated to Butner, and that the transfer process could take anywhere from two days to two weeks. Tr. 197-99. The government opposed Hallinan's release, asserting that the lengthy sentence and significant forfeiture order gave him a great incentive to flee. Tr. 199-201.

Hallinan's counsel argued that he was not a flight risk given his medical conditions and the high bail conditions. Counsel noted that Hallinan had received one of the six weekly chemotherapy treatments for his bladder cancer, and needed to continue this treatment. He expressed skepticism that BOP would do such a quick designation, which he claimed would ordinarily take up to 60 days. Tr. 202-03. Counsel noted that the government had earlier stated that the Court had also spoken with regional counsel about this issue, but that counsel himself had not spoken to BOP. He asked that Hallinan be allowed to self-report once he was designated to Butner. Tr. 203-05. Counsel further requested that the Court allow Hallinan to complete his first round of chemotherapy and the follow up MRI in July 16, 2018, before reporting. Tr. 206.

The government objected to the defense request, arguing that Hallinan posed a serious flight risk, but if the Court disagreed, Hallinan should be ordered to report within 48 hours of designation, which was imminent. Tr. 208. The Court agreed that Hallinan posed a flight risk. The Court further noted that he had shown no remorse or contrition, that he had obstructed justice, and that "we don't really know the extent of the assets that he has and to what extent those assets could be secured and hidden." Tr. 201. The Court did not remand Hallinan into custody, but ordered him to report to the designated facility on July 17, 2018, adding that if BOP failed to designate a location by 9 a.m. on July 16, it would hold a hearing on that day to revisit the reporting order. Tr. 210-11. After Hallinan filed his motion for bail pending appeal on July 10, 2018, this Court extended Hallinan's reporting date to July 30, 2018.

Hallinan's motion for bail pending appeal on the basis of his medical condition should be denied for the simple reason that a defendant's medical condition is not a proper basis for release. In addition, the record demonstrates that Hallinan's claim that the Court erred in finding that BOP could adequately care for him and denying his request for a variance on this basis is meritless, and certainly does not present a substantial question on appeal. As defense counsel agreed at the conclusion of the hearing, the Court committed no procedural error in imposing sentence. The Court conducted a lengthy and thorough hearing on this issue, and reasonably concluded that the government's evidence established that BOP could provide appropriate medical care for Hallinan. That Hallinan

disagrees with the Court's assessment of the evidence does not render the Court's finding clearly erroneous or procedurally unsound.

To the extent he challenges the Court's assessment of the weight and credibility of testimony, that challenge will fail under the clear error standard of review. "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985). Moreover, "[w]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Id.* at 575. *See also United States v. Igbonwa*, 120 F.3d 437, 441 (3d Cir. 1997) (applying this rule in criminal case).

Hallinan would certainly not prevail on a claim that the sentence was substantively unreasonable, as he could not establish that no Court would have imposed the same sentence under the facts and circumstances of this case. *See United States v. Tomko*, 562 F 3d 558 (3d Cir. 2009) (en banc).

All that is left is Hallinan's complaint that the sentence should not stand because it was based in part on an improper "ex parte" communication with the BOP about whether BOP "could adequately treat Hallinan and/or to what facility

he might be sent." Mtn. 18. He is wrong. Hallinan's argument is based on the prosecutor's statement that he contacted BOP regional counsel regarding Hallinan's likely designation, and as Hallinan's own experts had opined, he was told that Hallinan was likely to be assigned to Butner. The prosecutor noted that he also learned from BOP counsel that the Court had also talked to BOP about the designation process. Tr. 124.[6]

Later in the hearing, after the Court had imposed sentence and was considering whether to remand or release Hallinan, the prosecutor provided an update from regional counsel confirming that there was an opening at Butner, that Hallinan would likely be sent there, and that the transfer process would take anywhere from two days to two weeks. Defense counsel then noted that he had not spoken to BOP and expressed skepticism about this timetable, noting the prosecutor's comment that the Court had also talked to BOP about this issue.

The Court did not address its communication with BOP counsel, but it is clear from the record that the conversation with BOP did not influence the Court's sentencing determination in any way. The record shows that the Court's reporting decision was based on the updated information provided at the hearing, as the Court agreed to revisit the issue if designation did not occur as promptly as the government expected. Moreover, there is absolutely no

---

[6] Although not on the record, when government counsel called BOP Regional Counsel Joyce Horikawa to inquire about the designation process in this case, counsel stated that the Court had also contacted her about this same issue. Horikawa never mentioned any other subject she addressed with the Court.

- 30 -

indication anywhere in the record that the Court had any discussions with BOP personnel about BOP's ability to provide medical care for Hallinan. Instead, the record makes clear that the Court's determination that BOP could provide proper medical care for Hallinan was based on the information and evidence presented by the parties in the sentencing proceeding.

Thus, the record shows that any contact between the Court and BOP related to the administrative designation process and not to the substantive issue at sentencing, which was whether the BOP could provide appropriate medical care for Hallinan. Indeed, defense counsel apparently thought as much at the hearing, as he referenced the Court's communication with BOP in questioning the government's representations about the timing of the designation process. At no point in the protracted argument about BOP's ability to care for Hallinan did counsel suggest that the Court had obtained or relied upon ex parte information in resolving this issue, or query the Court about its contact with BOP.

The Court's contact with BOP was entirely proper. While ex parte communications between a judge and a litigant are strongly disfavored, even they are also not inherently impermissible, and are tolerated in the context of discussions regarding non-merits issues or to address administrative matters. *See In re School Asbestos Litigation*, 977 F.2d 764, 789 (3d Cir. 1992), as amended (Oct. 8, 1992). In contrast, the law frowns upon ex parte communications between judges and court-appointed experts. *See United States v. Green*, 544 F.2d 138, 146 n.16 (3d Cir. 1976) ("the court should avoid ex parte

communications with anyone associated with the trial, even its own appointed expert."). In addition, a sentencing court may not rely on undisclosed ex parte evidence in determining the sentence. *See United States v. Hayes,* 171 F.3d 389, 395 (6th Cir. 1999). But none of this happened in this case. Rather, the Court contacted BOP regional counsel regarding the administrative process relating to the defendant's designation in this case. BOP counsel was not a party or witness in this case, and the communication did not relate to the substantive sentencing determination. There simply was no improper ex parte communication, and Hallinan's claim to the contrary is unfounded.

In sum, Hallinan has not identified any substantial question regarding the propriety of the sentence in this case, and he in not entitled to bail pending appeal on this ground.

### 4. The jury instructions regarding RICO mens rea do not present a substantial question.

Lastly, Hallinan asserts that the jury instructions with regard to the RICO charges in this case present a substantial issue for review, warranting bail pending appeal. That is incorrect.

As stated above, the objection does not present a substantial question of review standing alone, because it would not result in a term of imprisonment less than the likely duration of the appeal, given the convictions on independent counts. The issue also is not substantial because it is meritless.

Hallinan focuses on the instructions regarding a conspiracy to violate RICO by "collection of an unlawful debt," as charged in Counts 1 and 2. This Court tracked the Third Circuit model instructions regarding RICO conspiracy, which repeatedly state that the government must prove that the offense was committed "knowingly." Hallinan asserts, however, that these instructions permitted a conviction without any proof that the he was aware of the unlawfulness of the debts at issue, and therefore risked a conviction for innocent conduct. He relies on *Liporata v. United States*, 471 U.S. 419 (1985).

In *Liporata*, the Supreme Court held that, in a prosecution for fraudulent use of food stamps, the government must prove that the defendant was aware of the existence and meaning of the regulation that his actions violated, a requirement akin to proof of willfulness. The Court explained that the statute would otherwise criminalize "a broad range of apparently innocent conduct." This concern does not apply, however, with respect to RICO, which in this case unambiguously and pursuant to the statute required proof of "collection of an unlawful debt." Thus, no case ever has applied *Liporata* or the willfulness standard to such a RICO prosecution.

Rather, where a statute does not identify the required mental state, "we read into the statute 'only that mens rea which is necessary to separate wrongful conduct from 'otherwise innocent conduct.'" *Elonis v. United States*, 135 S. Ct. 2001, 2010-11 (2015), quoting *Carter v. United States*, 530 U.S. 255, 269 (2000). In the RICO context, as reflected in the Third Circuit model instructions, courts

have uniformly found the ordinary "knowing" standard sufficient, given that the collection of unlawful debt is undoubtedly wrongful.

The jury was repeatedly advised that the charges involved the "collection of an unlawful debt." The Court further instructed: "it is sufficient if the Government proves beyond a reasonable doubt that the Defendant agreed to participate in the enterprise with the knowledge and intent that the collection of an unlawful debt in the conduct of the affairs of the enterprise would be committed by a member or members of the enterprise, which may include the Defendant." 11-20-17 tr. at 41.

Later, the Court repeated: "In order to find a defendant guilty of conspiracy, you must find that the Government proved beyond a reasonable doubt that the defendant joined the conspiracy knowing of its objective and intending to help further or achieve that objective. That is, the Government must prove that the defendant knew of the objective or goal of the conspiracy, the collection of unlawful debt; two, that the defendant joined the conspiracy intending to help further or achieve the goal or objective of the collection of unlawful debt; and, three, that the defendant and at least one other alleged conspirator shared a unity of purpose towards that objective or goal." *Id.* at 55-56.

The Court defined an unlawful debt as one that "was unenforceable in whole or in part under Federal or state law because of the laws relating to usury; and . . . was incurred in connection with the business of lending money or

anything of value at a rate that was usurious under Federal or state law where the rate was at least twice the legally enforceable rate." *Id.* at 51-52. The Court further defined usury. *Id.*

> The Court added:
>
> To convict a defendant of conspiracy to violate RICO, the Government is not required to prove that a defendant knew that his acts were against the law. Instead, a defendant must generally know the facts that make his conduct fit into the definition of the charged offense, even if the defendant did not know that those facts gave rise to a crime. Ignorance of the law is no excuse.
>
> To prove a defendant guilty of conspiracy to collect unlawful debt, the Government is not required to prove that a defendant knew that the usury rates were in the states where the borrowers lived.

*Id.* at 54.

Read as a whole, these instructions are correct. The jury was required to find that Hallinan knew the purpose of the conspiracy was to collect unlawful debts, without any requirement that he knew the particulars of the laws that made the debts wrongful, or knew that his own conduct was illegal. These requirements were consistent with the model instructions and sufficient to separate wrongful conduct from otherwise innocent conduct.

And then, to reinforce these instructions, and at the defendant's request, the Court gave a good faith instruction. The Court directed:

> If you find that the defendant acted in, quote, "good faith," close quote, that would be a complete defense to those charges, because good faith on the part of a defendant would be inconsistent with his acting with knowledge and intent. For purpose of a RICO charge, a person acts in good faith when he or she has an honestly held belief, opinion or understanding that the goal or objective of the conspiracy was not the collection of unlawful debt,

as that term is defined above in paragraph 170, even if the belief, opinion or understanding turns out to be inaccurate or incorrect.

Thus, in this case, if the defendant made an honest mistake or had an honest misunderstanding about whether the goal or objective of the conspiracy was the collection of unlawful debt, then he did not act with knowledge and intent.

*Id.* at 59-60.

In sum, the RICO jury instructions were appropriate. For that reason, the

issue is not a substantial one warranting bail pending appeal.


## IV.  Conclusion.

For the reasons stated above, the motion for bail pending appeal should be

denied.

Respectfully yours,

WILLIAM M. McSWAIN
United States Attorney


*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals


*/s Mark B. Dubnoff*
MARK B. DUBNOFF
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that this pleading has been served on the Filing Users identified below through the Electronic Case Filing (ECF) system:

Edwin J. Jacobs, Jr., Esq.
Jacobs & Barbone, P.A.
1125 Pacific Avenue
Atlantic City, NJ  08401

Michael M. Rosensaft, Esq.
Katten Muchin Rosenman LLP
575 Madison Avenue
New York, NY 10022-2585

Andrew K. Stutzman, Esq.
Stradley Ronon Stevens & Young LLP
2005 Market Street, Suite 2600
Philadelphia, PA  19103

*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney

DATED:  July 18, 2018.